No. 25-13412

In the

# United States Court of Appeals
## for the Eleventh Circuit

Kenny A., et al.,

*Plaintiff-Appellees*,

v.

Governor of the State of Georgia, et al.,

*Defendant-Appellants*.

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:02-cv-01686 — Thomas W. Thrash, *Judge*

## BRIEF OF DEFENDANT-APPELLANTS

Harold D. Melton
Alexander J. Hill
Jacob A. Rodon

Christopher M. Carr
*Attorney General of Georgia*
Stephen J. Petrany
*Solicitor General*
Elijah J. O'Kelley
*Deputy Solicitor General*
Christian Sullivan
*Honors Fellow*

Troutman Pepper Locke, LLP
600 Peachtree Street, NE
Atlanta, Georgia 30309
(404) 885-3062
harold.melton@troutman.com

Office of the Georgia
Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(470) 816-1342
eokelley@law.ga.gov
*Counsel for Defendant-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellants request oral argument in this case. The district court ruled that numerous government officials are bound to policy decisions their predecessors made in signing a consent decree decades ago, despite overwhelming changed circumstances and no ongoing violation of federal law. That is directly contrary to the Supreme Court's decision in *Horne v. Flores*, 557 U.S. 433, 454 (2009), which the district court inexplicably refused even to *apply*. Oral argument would aid in correcting the district court's error and preventing repeat errors.

# TABLE OF CONTENTS

**Page**

Table of Authorities ........................................................................ iii

Jurisdiction ................................................................................ viii

Statement of Issues ........................................................................ 1

Introduction ................................................................................ 2

Statement of the Case.................................................................... 5

    A. Factual Background ............................................................ 6

    B. Proceedings Below............................................................ 18

    C. Standard of Review ............................................................ 21

Summary of Argument .................................................................. 21

Argument .................................................................................. 25

    I. *Horne* requires the consent decree to be terminated. ........ 25

        A. *Horne* applies to consent decrees. ................................. 25

        B. There are numerous changed circumstances, including changes to policymakers, laws, funding, and more. ..... 38

        C. There is no ongoing violation of federal law. ................ 47

Conclusion.................................................................................. 54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cadet v. Fla. Dep't of Corr.*,
  853 F.3d 1216 (11th Cir. 2017) ................................................. 32

*Chisom v. Louisiana ex rel. Landry*,
  116 F.4th 309 (5th Cir. 2024)...........................................4, 22, 34

*Frew ex rel. Frew v. Hawkins*,
  540 U.S. 431 (2004) ...........................................................30, 37

*Gould v. Interface, Inc.*,
  153 F.4th 1346 (11th Cir. 2025)................................................. 48

\*Horne v. Flores,
  557 U.S. 433 (2009) ............ 1–5, 18, 19, 21–23, 25–42, 44–46, 53

*Jackson v. Los Lunas Cmty. Program*,
  880 F.3d 1176 (10th Cir. 2018) ...........................4, 22, 33, 36, 54

*John B. v. Emkes*,
  710 F.3d 394 (6th Cir. 2013) ...........................................4, 22, 33

*Littlejohn v. Sch. Bd. of Leon Cnty., Fla.*,
  132 F.4th 1232 (11th Cir. 2025)................................................. 48

*Mathis v. United States*,
  579 U.S. 500 (2016) ................................................................. 32

*Milliken v. Bradley*,
  433 U.S. 267 (2009) ................................................................. 34

\*Peery v. City of Miami,
  977 F.3d 1061 (11th Cir. 2020) . 1, 3–5, 21, 22, 25, 26, 29, 32, 33, 53

*Ray v. Foltz,*
    370 F.3d 1079 (11th Cir. 2004) ............................................23, 49

*Rufo v. Inmates of Suffolk County Jail,*
    502 U.S. 367 (1992) ................................................................ 36

*Shakman v. Pritzker,*
    43 F.4th 723 (7th Cir. 2022)....................................4, 22, 33, 39

*Taylor ex rel. Walker v. Ledbetter,*
    818 F.2d 791 (11th Cir. 1987) (en banc) .................................. 48

**Statutory Authority**

Bipartisan Budget Act of 2018, Pub. L. No. 115-123,
    132 Stat. 64.................................................................... 14

Child and Family Services Improvement Act of 2006,
    Pub. L. No. 109-288, 120 Stat. 1233 ........................................ 13

Child and Family Services Improvement and
    Innovation Act, Pub. L. No. 112-34, 125 Stat. 369
    (2011) ................................................................................... 13

Fostering Connections to Success and Increasing
    Adoptions Act of 2008, Pub. L. No. 110-351, 122
    Stat. 3949 ................................................................................ 17

Preventing Sex Trafficking and Strengthening
    Families Act of 2014, Pub. L. No. 113-183, 128 Stat.
    1919 ..................................................................................16, 17

42 USC § 622(b)(18) ....................................................................... 14

H.B. 242, 152nd Gen. Assemb. Reg. Sess. (Ga. 2013).................... 8

H.B. 744, 152nd Gen. Assemb. Reg. Sess. (Ga. 2014)................... 12

H.B. 750, 153rd Gen. Assemb. Reg. Sess. (Ga. 2015) ................... 12

H.B. 67, 157th Gen. Assemb. Reg. Sess. (Ga. 2024) ..................... 12

O.C.G.A. § 15-11-2 ................................................................9, 10, 41

O.C.G.A § 15-11-38 .................................................................10, 41

O.C.G.A § 15-11-103 ................................................................ 9, 41

O.C.G.A § 15-11-130 ................................................................ 9, 42

O.C.G.A § 15-11-131 ................................................................ 9, 42

O.C.G.A § 15-11-145 ................................................................ 9, 42

O.C.G.A. § 15-11-146 ..................................................................... 9

O.C.G.A. § 15-11-200 ............................................................9, 42, 52

O.C.G.A. § 15-11-201 ................................................................17, 44

O.C.G.A. § 15-11-211 ...................................................................... 17

O.C.G.A § 15-11-230 ................................................................17, 44

O.C.G.A. § 15-11-262 ..................................................................... 52

O.C.G.A. § 15-11-476 ................................................................ 9, 41

**Other Authorities**

45 C.F.R. § 1355.36 ........................................................................ 52

Federal Rule of Civil Procedure 60  ... 18, 21, 25– 27, 32, 33, 35, 37, 38

*2024 Child and Family Servs. Reviews Georgia Final Report*, Children's Bureau .................................15, 16, 49, 50, 52

*2021-2022 Ga. Juvenile Justice Incentive Grant Evaluation Report*, Carl Vinson Inst. of Gov't........................... 17

*Child & Family Services Review (CFSR)*, Ga. Dep't of Hum. Servs., Div. of Fam. & Children Servs. ........................... 15

*Child & Family Services Reviews (CFSRs)*, Children's Bureau ...................................................................... 14

*Child and Family Services Reviews Procedures Manual*, Children's Bureau ................................................. 15, 52

*Embracing Common Wisdom: The New Juvenile Code in Georgia*, Ga. Appleseed Ctr. For L. & Just. (Apr. 2018) ..................................................................... 18

*Federal Reviews and Plans*, Ga. Dep't of Hum. Servs., Division of Family & Children Servs., .................... 14

*Georgia Division of Family & Children Services Child Welfare Policy Manual*, Ga. Dep't of Hum. Servs. .................... 49

*Gov. Kemp Signs FY26 Budget - Providing Hurricane Helene Relief and Important Investments in Education, Healthcare, and Public Safety,* Office of the Governor (May 9, 2025) ........................................ 13, 46, 49

Jill Nolin & Ross Williams, *State agency heads outline spending plans for Georgia's child welfare, safety-net, mental health*, Ga. Recorder (Jan. 18, 2024) .................... 13

Melissa D. Carter, *Bending the Arc Toward Justice: The Current Era of Juvenile Justice Reform in Georgia*, 54 Ga. L. Rev. 1133 (2020) ............................................ 8

*Round 3 of the CFSRs*, Children's Bureau .................................. 16

*Round 4 of the CFSRs*, Children's Bureau .................................. 16

State Fiscal Year 2024 Annual Report, Ga. Dep't of Hum. Servs. ............................................................................ 11

*State of Hope*, Ga. Dep't of Hum. Servs., Div. of Family & Children Servs. ...................................................... 12

Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Welfare Laws*, 12 B.U. Pub. Int. L. J. 259 (2003) ........................................................................... 43

## JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because the underlying legal claims arise out of federal law.

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1) because the district court denied a motion to terminate a consent decree.

This appeal is timely because the district court issued its decision on August 27, 2025, Doc. 821, and Defendant-Appellants filed a notice of appeal on September 25, 2025, Doc. 822.

## STATEMENT OF ISSUES

1. Did the district court err in ruling that *Horne v. Flores*, 557 U.S. 433 (2009), applies only to injunctions and not consent decrees, even though *Horne* expressly states a rule for "an injunction or consent decree," *id.* at 453, discusses consent decrees at great length, *id.* at 448–50, and this Court has already adopted *Horne*'s reasoning in the consent decree context, *see Peery v. City of Miami*, 977 F.3d 1061, 1069 (11th Cir. 2020)?

2. Did the district court err in not terminating a consent decree originally adopted in 2005 where there are entirely new political leaders bringing new policy insights to the issues, as well as a host of other changed legal and factual circumstances, and no ongoing violation of federal law?

1

## INTRODUCTION

The Supreme Court has instructed that, to decide whether to terminate a consent decree, courts "need[] to ascertain whether ongoing enforcement of the original order [is] supported by an ongoing violation of federal law." *Horne*, 557 U.S. at 454. That approach is required in "institutional reform litigation" so that today's policymakers cannot "insulate[] the policies embedded in the order … from challenge and amendment" by future policymakers and "thereby improperly deprive future officials of their designated legislative and executive powers," "bind state and local officials to the policy preferences of their predecessors," and "improperly interfere with a State's democratic processes." *Id.* at 449, 453 (quotations omitted). Where there is no longer a violation of federal law, "responsibility for discharging the State's obligations [must be] returned promptly to the State and its officials." *Id.* at 450 (quotation omitted).

*Horne* makes this appeal easy. In 2005, state officials agreed to a consent decree generally requiring changes to Georgia's child foster care system in DeKalb and Fulton Counties, but with statewide implications, Doc. 488, and in 2016 they agreed to a modified version of it, Doc. 745. But there have been numerous changed circumstances since 2005, including changes to state and

2

federal law and an entirely new set of policymakers bringing entirely "new policy insights." *Horne*, 557 U.S. at 448. Plus, there is no "ongoing violation of federal law" to speak of, *id.* at 454, if there ever were one. To hold that the consent decree must continue, even without *any* current federal law violation, is to make "the risks of institutional reform litigation into reality," *id.* at 453, and to "usurp the role of elected officials and deprive the people of their right to a democratically accountable government," *Peery*, 977 F.3d at 1069.

Yet, remarkably, that is exactly what the district court did. Despite the Supreme Court's clear directive that courts "need[] to ascertain whether" there is "an ongoing violation of federal law," *Horne*, 557 U.S. at 454, the district court concluded it "need not address … whether there are ongoing violations of federal law," Doc. 821 at 9. The district court barely justified its open defiance of Supreme Court precedent, simply insisting that *Horne* is limited to "the specific facts of the case," by which the court meant it was limited to cases involving an injunction issued after a bench trial "crafted specifically to remedy the federal law violations." *Id.* at 8.

At best, the district court's reasoning ignores the *extensive* portions of *Horne* that specifically discuss consent decrees, that

3

group consent decrees with injunctions, and that undermine any attempt to distinguish the decision as inapplicable to consent decrees. It also ignores that this Court (and every circuit to consider the issue) has already applied *Horne*'s reasoning in the consent decree context. *See Peery*, 977 F.3d at 1069; *see also Chisom v. Louisiana ex rel. Landry*, 116 F.4th 309, 316–17 (5th Cir. 2024) (en banc); *Shakman v. Pritzker*, 43 F.4th 723, 730–32 (7th Cir. 2022); *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1198 (10th Cir. 2018); *John B. v. Emkes*, 710 F.3d 394, 412 (6th Cir. 2013).

The district court's decision suggests a paradox. The court seems to have believed that the consent decree in this case is unlike the injunction in *Horne* because the injunction in *Horne* was "crafted specifically to remedy the federal law violations" involved. Doc. 821 at 8. But it *must* be that the consent decree in this case was also "crafted specifically to remedy the [alleged] federal law violations," *id.*, because "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate federal law or does not flow from such a violation," *Horne*, 557 U.S. at 450 (quotation omitted and alteration adopted). Either the district court's distinction does not hold, in which case *Horne* applies and the consent decree should

4

be terminated, or the consent decree was never aimed at remedying any federal law violation, in which case the consent decree exceeds the judicial power and should be terminated. All paths require termination.

Because there is no ongoing violation of federal law, "continued enforcement of the consent decree is not only unnecessary, but improper." *Peery*, 977 F.3d at 1069 (quoting *Horne*, 557 U.S. at 450) (alteration adopted). This Court should reverse.

## STATEMENT OF THE CASE

In 2002, Plaintiff-Appellees, a group of foster care children, sued Defendant-Appellants the Governor of Georgia, the Department of Human Resources and its Commissioner,[1] and the DeKalb and Fulton County Departments of Family and Children Services and their Directors, as well as both counties. Doc. 194-1. The parties eventually entered into a consent decree in 2005. Doc. 488. That decree has been modified at various times, most recently in 2016. Doc. 745. Defendants moved to terminate the

---

[1] After a restructuring in 2009, the Department of Human Resources is now known as the Department of Human Services.

consent decree in September 2024, Doc. 793, and the district court denied that motion, Doc. 821.

### A. Factual Background

**1.** According to Plaintiffs' allegations, in the late 1990s and early 2000s, Georgia's foster care system was characterized by high caseloads, high caseworker turnover, and a lack of placement resources that led to inconsistent treatment of children in foster care. Doc. 194 at 46–47. Investigations in Fulton and DeKalb Counties supposedly revealed little regulatory oversight, significant overcrowding of existing facilities, unsanitary living conditions, and inadequate responses to child abuse. *Id.* at 22–23. Based on those alleged conditions, Plaintiffs filed a class action lawsuit on behalf of children in Georgia's foster care system in DeKalb and Fulton Counties.

Plaintiffs asserted a host of claims under state and federal law. As to federal law, Plaintiffs claimed that Georgia's foster care system was so poorly run that it violated a variety of purported substantive due process rights, such as the alleged "right to a living environment that protects foster children's … well-being." Doc. 194-1 at 29–32. Plaintiffs separately asserted a single claim under the First, Ninth, and Fourteenth Amendments jointly, based on Defendants allegedly

interfering with familial associational rights. Doc. 194-1 at 32–33. They also asserted that Defendants were violating three federal statutes. One was the Federal Adoption Assistance and Child Welfare Act, which Plaintiffs claimed Defendants were violating by, among other things, not having timely written case plans and not providing for essential needs. *Id.* at 35–37. The second was the Multiethnic Placement Act and the Interethnic Adoption Provisions of 1996, which Plaintiffs claimed Defendants were violating by denying or delaying adoptive placement based on race. *Id.* at 44. And the third was the Federal Early Periodic Screening, Diagnosis and Treatment Program of the Medicaid Act, based on Defendants allegedly not providing medically necessary care. *Id.* at 45. Premised entirely on those statutory claims, Plaintiffs asserted that Defendants violated procedural due process by depriving them of their statutory rights without adequate process. *Id.* at 46–47.

Without any liability ruling, the parties eventually signed a consent decree, effective October 2005. *See* Doc. 488. The consent decree established 31 outcome measures to track the improvement of Georgia's foster care system, Doc. 488-1 at 8–15, monitored by "accountability agents," *id.* at 15–16. By its terms, the decree would end when Georgia's foster care system was "in substantial

compliance with" the outcome measures. *Id.* at 19. The consent decree was later modified in 2009, 2010, and 2016, with those outcome measures remaining largely consistent across the modifications. *See* Docs. 612, 687, 740.

**2.** As compared to when this lawsuit was filed, Georgia's foster care system today is unrecognizable. The State has made significant legal, fiscal, policy, and administrative changes to its foster care system, resulting in better outcomes for children, parents, and caseworkers.

Chief among these changes is the complete overhaul of Georgia's Juvenile Code. Before 2004, Georgia's Juvenile Code was "difficult to use, lack[ed] . . . clarity, and [was] outdated" in part because it did not reflect "research-based best practices and the latest scientific findings on child and adolescent brain development." Melissa D. Carter, *Bending the Arc Toward Justice: The Current Era of Juvenile Justice Reform in Georgia*, 54 Ga. L. Rev. 1133, 1150 (2020). Over the course of nearly a decade, judges, attorneys, juvenile justice advocates, and other stakeholders discussed how to transform the Juvenile Code. *Id.* at 1150–53. Those efforts culminated with the unanimous passage of House Bill 242, which then-Governor Nathan Deal signed into law on May 2, 2013. *See* H.B. 242, 152nd Gen. Assemb., Reg. Sess.

(Ga. 2013), https://tinyurl.com/4t4jmywx. HB 242 integrated disparate sections of the Juvenile Code into one section, amended substantive provisions to comply with federal law, and implemented new procedures and proceedings to improve dependency and delinquency proceedings. Carter, *supra* at 1155; *see, e.g.*, O.C.G.A. § 15-11-146.

HB 242 contained many provisions to address the foster system's shortcomings. The Code gives children a greater voice in their treatment in the foster care and juvenile justice system by treating them as parties to judicial proceedings, *see* O.C.G.A. § 15-11-2(52), and granting them the right to court-appointed attorneys, *id.* § 15-11-103, and guardians ad litem, *id.* § 15-11-476. The Juvenile Code also comprehensively overhauled dependency proceedings and gives the Division of Family and Children Services, as well as other stakeholders such as physicians and hospitals, greater powers to take emergency action to protect victims of child abuse and neglect. *See id.* §§ 15-11-130–31. The Division is also now subject to strict timelines for initiating preliminary protective hearings, filing petitions for dependency, *id.* § 15-11-145(a), (g), and writing case reports for children in the foster care system, *id.* § 15-11-200.

The Juvenile Code also created a new method for assisting children in need of services, a broad category of at-risk youth. *See id.* § 15-11-2(11). Instead of detention, juvenile courts can divert these children to participate in a "community based risk reduction program" or "an early intervention program." *Id.* § 15-11-38(a), (b). These programs ensure that there is ample communication between the juvenile court, school systems, mental health agencies, healthcare providers, and social services to ensure the best outcome for the child. *See id.* § 15-11-38(c).

Additionally, the State has transformed the Division into a modern foster care agency, adding multiple teams to address past deficiencies. It now has a Federal Regulations and Data Section team that employs data analysis to inform policy making. Doc. 793-2 at 7. Its Medical Appeals Team of specialized healthcare attorneys supports caseworkers with appeals of denials of coverage for foster children's medically necessary treatment. *Id.* at 5. The Office of Health Law and Policy, which houses the Medical Appeals teams, meets monthly with the State Medicaid Agency and Amerigroup, the State's insurance provider, to discuss appeals and prevent denials of medical treatment to foster children. *Id.* Similarly, the Division created new positions to

ensure regional compliance with federal regulations and receive feedback from stakeholders across the state. *Id.* at 7, 9–10.

The Division has also implemented new computer programs to streamline the collection of data and efficiently manage pressing issues. It established a centralized call center for child abuse allegations, Doc. 793-3 at 4, and an improved statewide computer system for all child welfare case records, Doc. 793-2 at 4. Its new case management platform, UniteUs, contains a self-referral form and a data-centric analysis tool that connects foster children with other partner agencies. *Id.* at 6. The ARGO placements software helps staff members identify placement options for foster children based on child-specific criteria. *Id.* at 4; *see also* State Fiscal Year 2024 Annual Report at 36, Ga. Dep't of Hum. Servs., https://tinyurl.com/4ch8n9nj.

The Division has addressed low caseworker and foster parent retention as well. It sponsors an "intense, one-on-one mentoring" program connecting new caseworkers to veteran supervisors. Doc. 793-2 at 5. The Kinship Care Continuum similarly links existing foster caregivers with new or prospective caregivers, building community among foster caregivers. *Id.* at 6. Another program, the State of Hope Initiative, provides competitive grants for community partnerships between government agencies, non-

11

profits, philanthropies, businesses, and other community members to build local safety nets for at-risk youth. *See State of Hope*, Ga. Dep't of Hum. Servs., Div. of Family & Children Servs., https://tinyurl.com/vjwmv4u.

Underwriting everything is the General Assembly's consistent commitment to expanding funding for foster care programs. Since 2015, state funding for children's mental health has increased 15%, the budget for the Department of Juvenile Justice has increased 26%, and allocations for adoptions services have increased 34%. *Compare* H.B. 67, 157th Gen. Assemb., Reg. Sess. (Ga. 2024), https://tinyurl.com/57n3cdzx, at 18, 49, 58, *with* H.B. 744, 152nd Gen. Assemb., Reg. Sess. (Ga. 2014), https://tinyurl.com/3xw6u6xm, at 27, 66, 79. State funding for children's welfare services has jumped 116% in the last ten years. *Compare* H.B. 67, *supra* at 50, *with* H.B. 744, *supra* at 63. Similarly, since creating a specific line-item allocation for child abuse and neglect-prevention programs in 2016, state funding has increased by 237%. *Compare* H.B. 750, 153rd Gen. Assemb., Reg. Sess. (Ga. 2015), https://tinyurl.com/mrxc5d8y, at 88, *with* H.B. 744, *supra* at 49.

The State's significant investment in the foster care system enables the Division to hire more caseworkers and increase these

caseworkers' salaries, boosting retention and reducing caseloads. *See, e.g.*, *Gov. Kemp Signs FY26 Budget - Providing Hurricane Helene Relief and Important Investments in Education, Healthcare, and Public Safety,* Office of the Governor (May 9, 2025), https://tinyurl.com/yurenyyx (reporting a $5 million increase in salary enhancements for social services caseworkers); Jill Nolin & Ross Williams, *State agency heads outline spending plans for Georgia's child welfare, safety-net, mental health*, Ga. Recorder (Jan. 18, 2024), https://tinyurl.com/525b26h7 (reporting that 1000 new caseworkers were hired in 2024 and the Division planned to reopen local offices).

Increased federal oversight has also transformed Georgia's foster care system. Multiple federal laws implemented since 2005 augment federal control over state foster care agencies through reporting requirements. To receive block grant funding, state foster care agencies must submit plans to the U.S. Department of Health and Human Services (HHS) describing their standards for the content and frequency of caseworker visits and guaranteeing, at a minimum, monthly caseworker visits. Child and Family Services Improvement Act of 2006, Pub. L. No. 109-288, §§ 4, 7, 120 Stat. 1233, 1236–42, 1248–49 (codified as amended at 42 U.S.C. §§ 622(b)(17), 624(f), 629g(f)); *see also* Child and Family

Services Improvement and Innovation Act, Pub. L. No. 112-34, § 101, 125 Stat. 369, 370–71 (2011) (codified as amended at 42 U.S.C. § 624(f)).  States must also submit to HHS policies addressing the treatment of foster children's emotional trauma and decreasing the time children under the age of five remain in state custody.  *See* 42 USC § 622(b)(18)).  And they must establish plans to prevent at-risk children from entering the foster care system and report success rates to HHS.  Bipartisan Budget Act of 2018, Pub. L. No. 115-123, § 50711, 132 Stat. 64, 232–34, 238–39 (codified as amended at 42 U.S.C. § 671(e)).

To ensure conformity to these and other reporting requirements, the Children's Bureau—a division of HHS—requires state agencies to submit reports to receive continued federal support.  *See Child & Family Services Reviews (CFSRs)*, Children's Bureau, https://tinyurl.com/2p9u2jpf.  States must submit five-year plans and annual updates on their foster care system to receive access to federal funds under Title IV-B of the Social Security Act.  *See Federal Reviews and Plans*, Ga. Dep't of Hum. Servs., Division of Family & Children Servs., https://tinyurl.com/mw5m9bs9.

States must also undergo periodic Child and Family Services Reviews.  These reviews are to "identify strengths and challenges

14

in state programs and systems" with the aim of improving safety and ensuring permanent homes for children. *Child & Family Services Review (CFSR)*, Ga. Dep't of Hum. Servs., Div. of Fam. & Children Servs., https://tinyurl.com/52k9nb89. States receive feedback from the Children's Bureau, and if they do not pass review, they must propose a Program Improvement Plan to be approved by the Children's Bureau. *Child and Family Services Reviews Procedures Manual*, Children's Bureau at 52–67, https://tinyurl.com/ye27fyjb. Passing generally requires states to conform with seven factors[2] in 95% or more of the cases the Bureau reviews. *Id.* at 5; *2024 Child and Family Servs. Reviews Georgia Final Report*, Children's Bureau at A-1, https://tinyurl.com/4r5em5r3. Upon approval, states have two years to implement the Plan, and if they do not make "satisfactory progress," the Children's Bureau withholds federal funding. *Id.* at 69.

---

[2] These factors include: (1) the state-wide child welfare information system; (2) the case review system; (3) the quality assurance system; (4) staff and provider training; (5) the service array and resource development; (6) the agency's responsiveness to the community; and (7) foster and adoptive parent licensing, recruitment, and retention. *Child and Family Services Reviews Procedures Manual*, *supra* at 6.

Thus far, no state has passed HHS review, even on the second decade and third round of reviews. *See, e.g.*, *Round 3 of the CFSRs*, Children's Bureau (June 30, 2024), https://tinyurl.com/652yx3fd. Georgia has submitted four reviews and three improvement plans. *Id.* The first review and improvement were completed in 2004, and Georgia has since undergone three more reviews and two more improvement plans, the most recent of which has not yet been submitted. *See Round 4 of the CFSRs*, Children's Bureau, https://tinyurl.com/bdzkr88a. In the most recent review before the district court, Georgia was found to be "in substantial conformity" with the systemic factors of the quality assurance system, agency responsiveness to the community, and foster and adoptive parent licensing, recruitment, and retention. *See 2024 Child and Family Servs. Reviews Georgia Final Report*, *supra* at 5. Georgia has not had funding withheld by the Children's Bureau.

In addition to reporting requirements and oversight, federal statutes have also altered children's and their relatives' rights in relation to state agencies. Under federal law, foster children now have the right to develop their own case plans after the age of 14 and may choose up to two members of their case planning team. Preventing Sex Trafficking and Strengthening Families Act of

2014, Pub. L. No. 113-183, § 113, 128 Stat. 1919, 1928 (codified as amended at 42 U.S.C. § 675(1)(B)).  Foster children also have a federally protected right to be heard regarding their desired outcome at permanency hearings.  *Id.* § 112, 128 Stat. at 1926 (codified as amended at 42 U.S.C. § 675a).  Federal law also grants notice and information rights to adult relatives of foster children regarding the children's removal from their parents' home and their rights as a relative or potential caregiver. Fostering Connections to Success and Increasing Adoptions Act of 2008, Pub. L. No. 110-351, § 103, 122 Stat. 3949, 3956 (codified as amended at 42 U.S.C. § 671(a)).  Georgia's foster care system allows for all of those things.  *See* O.C.G.A. § 15-11-201(b)(15)(B); *id.* § 15-11-230(e); *id.* § 15-11-211(c).

Those sweeping reforms to Georgia's foster care system have created an entirely new regulatory landscape much different from what existed when the consent decree was entered, and it has resulted in a marked increase in positive outcomes.  Out-of-home placements for foster children in the juvenile justice system have consistently declined, with the most recent available data suggesting a 74% reduction in out-of-home placements.  *See 2021-2022 Ga. Juvenile Justice Incentive Grant Evaluation Report*, Carl Vinson Inst. of Gov't at 31, https://tinyurl.com/trtd6km6.  The

17

reforms to the Juvenile Code have been "implemented as written" and have "work[ed] remarkably well in dependency and delinquency proceedings." *Embracing Common Wisdom: The New Juvenile Code in Georgia*, Ga. Appleseed Ctr. For L. & Just. (Apr. 2018) at 1, https://tinyurl.com/2w234vz4.  Crucially, 97% of indigent children are represented by counsel.  *Id.* at 6.  Georgia's foster care system performs better than the national average in protecting children from abuse and neglect.  *See 2024 Child and Family Servs. Reviews Georgia Final Report*, *supra* at 6–7.  And in the latest Child and Family Services Review, the Division ranked highly in its level of collaboration and consultation with local, state, and federal stakeholders and its ability to recruit and retain foster and adoptive homes.  *Id.* at 20.

### B.   Proceedings Below

In September 2024, Defendants moved to terminate the consent decree under Federal Rules of Civil Procedure 60(b)(5) and (b)(6).  Doc. 793.  Defendants generally argued that there is no ongoing violation of federal law, which under *Horne* requires termination; (2) that significant changes in both the factual and legal circumstances of Georgia's child welfare system had essentially accomplished the consent decree's purpose of creating long-lasting reform in Georgia's child welfare system; and (3) that

continued enforcement of the consent decree improperly infringes on Georgia's citizens' right to self-governance. *See generally* Doc. 793-1 at 18–66.

Plaintiffs opposed the motion to terminate. Doc. 804. They largely brushed *Horne* aside, ignoring its requirement to show an ongoing violation of federal law. Indeed, Plaintiffs never argued that any federal law is currently being violated, instead arguing that Plaintiffs have not complied well enough with the consent decree itself. *See, e.g.*, Doc. 804 at 37. (It is undisputed that at least 21 of the consent decree's 31 outcome measures have been achieved. Doc. 787 at 17.).

The district court denied the motion to terminate. Doc. 821. It rejected Defendants' argument that *Horne* applies, reasoning *Horne* is "factually distinguishable" because it did not involve "a settlement-related consent decree" but an injunction "issued after the Court held a bench trial and found that certain federal law violations were occurring." *Id.* at 7–8. According to the court, that meant the Supreme Court's focus on whether there was an ongoing violation of federal law is only applicable "under the specific facts" of *Horne*. *Id.* at 8. The court reasoned that older Supreme Court precedent does not require determining if there is an ongoing violation of federal law, *id.* at 8–9, and that it would

19

not "make sense, practically speaking," to "conduct a summary judgment-like inquiry into whether there are" federal law "violations for the first time over twenty years into the administration of this case," *id.* at 9. Based on that, the court concluded it "need not address the Defendants['] arguments as to whether there are ongoing violations of federal law to be remedied by continued enforcement of the 2016 consent decree." *Id.*

Detached from *Horne*'s ongoing-violation-of-federal-law standard, the district court considered whether changed circumstances made continued enforcement of the consent decree "detrimental to the public interest" in some general sense. *Id.* at 11. It rejected as "nothing more than gripes" Defendants' arguments that vast changes in state and federal law have duplicated much of the consent decree and otherwise substantially reformed Defendants' practices. *Id.* at 12. The district court also disagreed that the "basic purpose" of the consent decree "has been satisfied" because Defendants have not fully complied with 10 of the 31 outcome measures. *Id.* at 12–14.[3]

---

[3] The district court separately denied a contempt motion Plaintiffs filed, Doc. 821 at 15–20, which is not at issue.

20

## C.   Standard of Review

This Court reviews for abuse of discretion "a decision regarding the enforcement or termination of a consent decree," reviewing factual findings for clear error and reviewing "*de novo* the interpretation of a consent decree and the application of a consent decree to the facts."  *Peery*, 977 F.3d at 1068.

## SUMMARY OF ARGUMENT

The district court refused to apply directly applicable and binding Supreme Court and Circuit precedent.  Under the correct legal test, the consent decree should be terminated.

**I.A.** The Supreme Court held in *Horne* that if a movant "is no longer in violation of" federal law, then "continued enforcement of the District Court's original order is inequitable within the meaning of Rule 60(b)(5), and relief is warranted."  557 U.S. at 470.  That rule is especially relevant in institutional reform litigation because "injunctions issued in such cases often remain in force for many years, and the passage of time frequently brings about changed circumstances—changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights—that warrant reexamination of the original judgment."  *Id.* at 447–48.  Thus, the questions are whether there are changed circumstances

and whether Defendants are currently violating any of the federal laws that the consent decree was premised on.

The district court refused to even ask, much less answer, these dispositive questions. It instead reasoned that *Horne* is inapplicable to consent decrees because *Horne* involved an injunction. Doc. 821 at 8–9. That shallow reasoning fails. The Supreme Court was explicit, at great length, that it was discussing not just injunctions but also consent decrees. *See Horne*, 557 U.S. at 448–50. And even had it not said so expressly, *Horne*'s reasoning applies with even greater force to consent decrees. Moreover, this Court has already applied *Horne* in the consent-decree context, *see Peery*, 977 F.3d at 1069, and so has every other circuit to consider the issue, *see Jackson*, 880 F.3d at 1198; *John B.*, 710 F.3d at 412; *Shakman*, 43 F.4th at 730–32; *Chisom*, 116 F.4th at 316–17.

**I.B.** A plethora of changed circumstances here "warrant reexamination of the original judgment." *Horne*, 557 U.S. at 448. One of them is the entirely new slate of policymakers and their accompanying "new policy insights" into the issues underlying the consent decree. *See id.* at 448–49. Beyond that, Georgia has dramatically overhauled its foster care system through the complete reworking of its Juvenile Code, extensive structural and

management reforms made to the Division, and significant funding increases. *See, e.g.*, Carter, *supra* at 1154–55; Doc. 793-2 at 4–5, 7, 10–12; Doc. 793-3 at 4; *supra* at 8–10. The growth of federal regulatory oversight has likewise spurred extensive improvements in the state's foster care system. All of those changed circumstances—to state law, to federal law, to organizational structures, and to funding—mirror the changed circumstances that supported reexamination in *Horne*. *See* 557 U.S. at 459–70.

**I.C.** There is no ongoing federal law violation to speak of. Indeed, Plaintiffs never even tried to argue to the district court that there is, and this Court can simply resolve the issue on forfeiture grounds. Either way, Plaintiffs certainly cannot substantiate any of the legal violations they originally alleged two decades ago.

Plaintiffs originally alleged violations of an amorphous collection of substantive due process rights, the right to family relationships, three federal statutes, and procedural due process. *See* Doc. 194-1. None of their claims withstand the slightest scrutiny today. Their substantive due process claim, for example, requires them to show deliberate indifference, or the outright disregard of "a risk of harm of which" the defendant is actually

aware. *Ray v. Foltz*, 370 F.3d 1079, 1083 (11th Cir. 2004).
Defendants' extensive efforts—and successes—in reforming
Georgia's foster care system show the exact opposite. Plaintiffs'
right-to-family-relationship claim fares no better. The consent
decree itself disproves this argument because Defendants have
satisfied the outcome measures associated with that claim,
meaning they've outperformed their (purported) constitutional
duty. *See* Doc. 818 at 35–38.

Equally meritless are Plaintiffs' statutory violation claims
and the procedural due process claim premised on them.
Plaintiffs claimed a violation of the Multiethnic Placement Act,
alleging Defendants had discriminated against children based on
race. *See* Doc. 194-1 at 44. But no recent report from
accountability agents has found anything remotely close to
problematic on that front. *See* Docs. 787, 808, 818. Plaintiffs
claimed a violation of the Federal Adoption Assistance and Child
Welfare Act, *see* Doc. 194-1 at 35–36, but all of the rights they
claim under that statute have been directly addressed through
state law changes, structural reforms, and federal oversight
standards. Plaintiffs claimed a violation of the Federal Early
Periodic Screening, Diagnosis and Treatment Program for
allegedly not receiving medically necessary care, *see* Doc. 194-1 at

45, but current evidence shows that nearly all medical needs are addressed and that the Division has a team dedicated specifically to preventing the denial of medically necessary claims, *see* Doc. 818 at 27; Doc. 793-3 at 5–6.

This Court should thus reverse and terminate the consent decree.

## ARGUMENT

The district court erred by refusing to do what *Horne* requires: consider whether there is an ongoing violation of federal law.  Under the correct analysis, numerous changed circumstances show that there is no ongoing violation of any of the federal laws that supposedly supported the consent decree.  That means the decree should be terminated.

## I. *Horne* requires the consent decree to be terminated.

### A. *Horne* applies to consent decrees.

**1.** Under Federal Rule of Civil Procedure 60(b)(5), a "district court may terminate a consent decree when 'the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable.'"  *Peery*, 977 F.3d at 1069 (quoting Fed. R. Civ. P. 60(b)(5)).  The third basis, that applying a

25

consent decree prospectively is no longer equitable, is the relevant one here.

Prospective application is no longer equitable "if a significant change either in factual conditions or in law renders continued enforcement detrimental to the public interest." *Horne*, 557 U.S. at 447 (quotation omitted). Whether continued enforcement is detrimental to the public interest depends on "whether ongoing enforcement of the original order [is] supported by an ongoing violation of federal law." *Id.* at 454. If the movant "is no longer in violation of the" underlying federal law, "continued enforcement … is inequitable within the meaning of Rule 60(b)(5), and relief is warranted." *Id.* at 470. Relief is, in fact, mandated: "Once a durable remedy is in place, 'continued enforcement of the [consent decree] is not only unnecessary, but improper.'" *Peery*, 977 F.3d at 1069 (quoting *Horne*, 557 U.S. at 450) (brackets in original).

*Horne* showed what that approach looks like in practice. The plaintiffs there had alleged that defendants were violating a federal statute that required the defendants take "appropriate action" to overcome language barriers to equal participation in education. *Horne*, 557 U.S. at 440 (quotation omitted). After a bench trial, a district court ruled the defendants were

underfunding English language instruction, and entered an injunction mandating certain funding levels. *Id.* at 441. The defendants later moved, under Rule 60(b)(5), for relief from that injunction. *Id.* at 443.

To determine whether the injunction should be terminated, the Supreme Court did not focus on whether the injunction and its funding levels had been satisfied. *See, e.g.*, *id.* at 451. What mattered instead was whether the defendants were in compliance with the underlying *statute*, regardless of what the *injunction* said. *Id.* Proving the point, to assess whether the injunction should be terminated, the Court pointed to several considerations *other* than funding levels, such as new English language instructional methodology, structural reforms in the local educational agency, and changed federal law—all of which may have shown compliance with federal law, even if irrelevant to the details of the injunction. *Id.* at 459–70.

The Supreme Court also explained at length why it took that approach and why it is inequitable for a court to enforce a decree despite the absence of an ongoing violation of federal law. *See id.* at 447–50. Discussing "institutional reform litigation," the Court noted that orders "often remain in force for many years" even though "changes in the nature of the underlying problem, changes

27

in governing law or its interpretation by the courts, and new policy insights" may come about "that warrant reexamination of the original judgment." *Id.* at 447–48.  There are also often "sensitive federalism concerns" because institutional reform litigation "commonly involves areas of core state responsibility, such as public education." *Id.*  Those federalism "concerns are heightened when … a federal court decree has the effect of dictating state or local budget priorities." *Id.*

Underlying those concerns is the deeper one: "the dynamics of institutional reform litigation differ from those of other cases." *Id.* Unlike in most ordinary litigation, "public officials sometimes consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law." *Id.*  Those officials may be "happy to be sued and happier still to lose" so that they can "block ordinary avenues of political change" or "sidestep political constraints." *Id.* at 448–49 (quotations omitted).  That's a major problem because orders arising from institutional reform litigation "bind state and local officials to the policy preferences of their predecessors and may thereby improperly deprive future officials of their designated legislative and executive powers." *Id.* at 449 (quotation omitted).  But "States and localities depend upon successor officials, both appointed and elected, to bring new

insights and solutions to problems." *Id.* (quotation omitted and alteration adopted).

Courts must of course "vigilantly enforce federal law," but they must also apply a "flexible approach" and "remain attentive to the fact that federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate federal law or does not flow from such a violation." *Id.* at 450 (quotation omitted and alteration adopted). The goal, in short, is to "ensure that responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant." *Id.* (quotation omitted). "To do otherwise is to usurp the role of elected officials and deprive the people of their right to a democratically accountable government." *Peery*, 977 F.3d at 1069.

**2.** Under *Horne*, the legal inquiry here is simple: Are Defendants currently violating any of the originally alleged federal laws? Because the answer is "no," *see infra* at I.C., the consent decree must be terminated. But here, the problem runs deeper, because the district court refused to even *consider* that dispositive question.

Despite *Horne*'s explicit instruction that courts "need[] to ascertain whether ongoing enforcement of the original order was

supported by an ongoing violation of federal law," 557 U.S. at 454, the district court declared that it "need not address … whether there are ongoing violations of federal law to be remedied by continued enforcement of the 2016 Consent Decree," Doc. 821 at 9. *Horne*, the court reasoned, is "factually distinguishable" because it involved an injunction after a bench trial instead of a consent decree. *Id.* That distinction is irrelevant, and the district court's order brazenly flouts *Horne*, this Court's precedent, and authority from other circuits.

Although it addressed an injunction in *Horne*, the Supreme Court said explicitly and repeatedly that the same rule applies to consent decrees. It stated that "once a party carries this burden [of showing changed circumstances], a court abuses its discretion when it refuses to modify an injunction *or consent decree* in light of such changes." *Id.* at 447 (quotation omitted and emphasis added). It explained that this analytical approach "allows a court to recognize that the longer an injunction *or consent decree* stays in place, the greater the risk that it will improperly interfere with a State's democratic processes." *Id.* at 453 (emphasis added). And it stated: "'If [a federal consent decree is] not limited to reasonable and necessary implementations of federal law,' it may 'improperly deprive future officials of their designated legislative and

30

executive powers.'"  *Id.* at 450 (quoting *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004)) (brackets in original).

There's much more.  When explaining why it is concerning that institutional litigation reform can "bind state and local officials to the policy preference of their predecessors," the Court relied on four different statements about consent decrees.  *Id.* at 449.  It cited a dissent from a Ninth Circuit judge "noting that consent decrees present a risk of collusion between advocacy groups and executive officials who want to bind the hands of future policymakers," *id.* (parenthetical of *Nw. Env't Advocs. v. EPA,* 340 F.3d 853, 855 (9th Cir. 2003) (Kleinfeld, J., dissenting)); it quoted a partial dissent from a Seventh Circuit judge stating that it "is not uncommon for consent decrees to be entered into on terms favorable to those challenging governmental action because of rifts within the bureaucracy or between the executive and legislative branches," *id.* (quoting *Ragsdale v. Turnock,* 941 F.2d 501, 517 (7th Cir. 1991) (Flaum, J., concurring in part and dissenting in part)); it quoted Judge Easterbrook's observation that "[t]omorrow's officeholder may conclude that today's is wrong, and there is no reason why embedding the regulation in a consent decree should immunize it from reexamination," *id.* (quoting Frank H. Easterbrook, *Justice and Contract in Consent*

*Judgments*, 1987 U. Chi. Legal F. 19, 40); and it quoted a think tank's conclusion that "[w]here state and local officials inherit overbroad or outdated consent decrees that limit their ability to respond to the priorities and concerns of their constituents, they are constrained in their ability to fulfill their duties as democratically-elected officials," *id.* (quotation and ellipsis omitted).

"A good rule of thumb for reading Supreme Court decisions is that what they say and what they mean are one and the same." *Cadet v. Fla. Dep't of Corr.*, 853 F.3d 1216, 1226–27 (11th Cir. 2017) (quoting *Mathis v. United States*, 579 U.S. 500, 514 (2016)) (alterations adopted). What the Court said in *Horne* is unmistakable: *Horne* applies to consent decrees. Indeed, *Horne*'s reasoning is *more* relevant to consent decrees than mere injunctions because consent decrees are more likely to involve attempts by policymakers to bind their successors absent any actual legal violation.

On top of all that, this Court has already applied *Horne* in the consent-decree context. This Court in *Peery* relied on *Horne* to explain why Rule 60(b)(5) is "especially flexible in the context of institutional-reform consent decrees" and why failing to promptly terminate consent decrees is "to usurp the role of elected officials

and deprive the people of their right to democratically accountable government." 977 F.3d at 1069. This Court even altered the following sentence from *Horne* to change the original word, "order," to the bracketed one "consent decree": "Once a durable remedy is in place, 'continued enforcement of the [consent decree] is not only unnecessary, but improper.'" *Id.* (quoting *Horne*, 557 U.S. at 450) (brackets in original). This Court was every bit as clear as the Supreme Court: *Horne* applies to consent decrees.

If that weren't enough, the four other circuits to address the question agree. The Tenth Circuit has held that "*Horne* fully applies to a Rule 60(b)(5) motion seeking modification of a consent decree." *Jackson*, 880 F.3d at 1198. It noted that "*Horne* uses 'consent decree' or 'decree' interchangeably with injunction and court order," and that "the same federalism concerns at the heart of *Horne* are present in institutional reform cases featuring consent decrees," especially as time goes on. *Id.* at 1198–99. The Sixth Circuit applied *Horne* to affirm a district court's termination of a consent decree because the movant had "achieved compliance with all of the provisions of federal law whose violation the decree sought to remedy." *John B.*, 710 F.3d at 412. The Seventh Circuit similarly applied *Horne* to reverse a district court's refusal to terminate a consent decree. *Shakman*, 43 F.4th at 730–32. And

the Fifth Circuit, under the "satisfied" prong of Rule 60(b)(5), applied *Horne* to terminate a consent decree, stressing the need to "be ever mindful of the impact of consent decrees on the principles of federalism" and to return power "to the State as promptly as possible." *Chisom*, 116 F.4th at 316–17.

The district court's rejection of *Horne* was not just unprecedented; it was based on a fundamental misunderstanding of consent decrees. Doc. 821 at 7–8. The court assumed that *Horne* focused on the presence of an ongoing legal violation only because the injunction in *Horne* was "crafted specifically to remedy the federal law violations that the Court found." *Id.* at 8. It thus cabined *Horne* to its "specific facts." *Id.* Although sparsely explained, the court's point seems to be that the consent decree in *this* case is different because it was *not* "crafted specifically to remedy the federal law violations" Plaintiffs alleged in 2003. *Id.*

That understanding is egregiously wrong; indeed, it *cannot* be right. As *Horne* itself makes clear, "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate federal law or does not flow from such a violation." 557 U.S. at 450 (quoting *Milliken v. Bradley*, 433 U.S. 267, 282 (2009)). *Every* injunction, order, or decree *must* be "crafted specifically to remedy the federal law violations" at issue,

34

Doc. 821 at 8, otherwise it exceeds the judicial power. That is the very premise of *Horne*.

The district court implied the opposite: the consent decree in this case cannot be evaluated by reference to ongoing federal law violations because the decree was never directed at remedying a federal law violation. Doc. 821 at 7–8. But the court was *never* authorized—in any way, at any time—to enter a consent decree detached from violations of federal law.

The district court offered some other reasoning for rejecting *Horne*, but none of it is correct. Bizarrely, it appealed to the *Horne* dissent. Doc. 821 at 8. But a lower court cannot rely on a dissent to override a majority, particularly where the dissent is complaining that the Court has changed the applicable legal rule. Even assuming the dissent were correct that the Supreme Court announced a new rule, that means lower courts are required to apply the new rule. Anyway, the specific portion of the dissent the district court cited just makes the undisputed point that a party cannot use Rule 60(b)(5) to retroactively challenge the *original* judgment, *Horne*, 557 U.S. at 492–93 (Breyer, J., dissenting), which is why the majority held that the analysis "takes the original judgment as a given and asks only whether" changed circumstances require discontinuing enforcement, *id.* at 453. But

that's irrelevant because nobody in this case is challenging whether there was a legal violation in 2005, only whether there is one *right now*.

The district court also erroneously sought cover from the Supreme Court's pre-*Horne* decision in *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992).  Doc. 821 at 8.  So did the dissent in *Horne*, which accused the majority of not properly following *Rufo*.  *See, e.g.*, 557 U.S. at 494–95 (Breyer, J., dissenting).  Whatever *Rufo* may have meant before *Horne* there's no debate about what it means now, because the Supreme Court in *Horne* expressly defined the standard.  It could not have been clearer: "our criticism is that the Court of Appeals did not engage in the changed-circumstances inquiry prescribed by *Rufo*."  *Id.* at 453 n.5.  By not considering all circumstances and whether there was an ongoing violation of federal law, "the Court of Appeals was not true to the *Rufo* standard."  *Id.*  The Supreme Court's "most recent proclamation" of the applicable legal rule governs. *Jackson*, 880 F.3d at 1199.  And anyway, *Rufo* addressed whether a court "decision that clarifies the law" can justify terminating a consent decree, *see* 502 U.S. at 390, not, as in *Horne*—and here— changes in the on-the-ground circumstances, including changed

36

statutes, wildly different factual underpinnings, and new policymakers and insights, *see Horne*, 557 U.S. at 459.

The district court also pointed to the pre-*Horne* decision in *Frew*, but that decision was about enforcement, not termination. Doc. 821 at 8–9. There, state officials entered a consent decree, but when the plaintiffs moved to enforce the decree, the officials argued that Eleventh Amendment immunity bars enforcing a consent decree *at all* "unless the court first identifies, at the enforcement stage," a federal law violation. *Frew*, 540 U.S. at 438. The Court rejected that argument because "[f]ederal courts are not reduced to approving consent decrees and hoping for compliance." *Id.* at 440. But that Eleventh Amendment issue about enforcement has nothing to do with later terminating the consent decree. *Frew* itself acknowledged concerns about consent decrees leading "to federal-court oversight of state programs for long periods of time even absent an ongoing violation of federal law." *Id.* at 441. And it explained that such concerns are a separate issue from the Eleventh Amendment, and one to be addressed under Rule 60(b)(5). *Id.* at 441. *Horne* then filled in the details of when Rule 60(b)(5) relief is required. That makes *Horne*, not *Frew*, the governing standard on the Rule 60(b)(5) issue.

Lastly, the district court reasoned that it would not "make sense, practically speaking," to "conduct a summary judgment-like inquiry into whether" there are federal law violations, Doc. 821 at 9. It is wholly unclear why that would be impractical—analyzing federal law is a core duty of the federal judiciary. But anyway, whether it is "practical" is irrelevant because conducting just such an analysis is mandated by the Supreme Court. *Horne*, 557 U.S. at 459. And on top of that, the district court imagined supposed practical complications where there were none. Because Plaintiffs did not even attempt to argue there were any ongoing federal law violations, there was no need for any summary judgment-like inquiry. The court could have, and should have, simply ruled for Defendants.

The district court "needed to ascertain whether ongoing enforcement of the original order was supported by an ongoing violation of federal law." *Id.* at 454. The court expressly refused to do that. That was error, and the clearest abuse of discretion.

## B.  There are numerous changed circumstances, including changes to policymakers, laws, funding, and more.

As explained, the focus under *Horne* is whether there is an ongoing violation of federal law. Because a Rule 60(b)(5) motion

cannot simply be used as an appeal of the original order, a movant must show a changed circumstance since the initial decree or order was entered. *See id.* at 453. These can be "factual and legal changes," *id.* at 459, including changes in state law and federal law as well as "changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights," *id.* at 448. This case involves a multitude of changed circumstances.

As noted, *Horne* identifies "new policy insights" as a changed circumstance that may "warrant reexamination of the original judgment." *Id.* at 439; *see also id.* at 448. The Court explained that "States and localities depend upon successor officials, both appointed and elected, to bring new insights and solutions to problems of allocating revenues and resources." *Id.* at 449 (quotation omitted and alteration adopted). The Seventh Circuit has similarly recognized that "new policy insights" come through turnover in policymakers, explaining that governors are "chosen by voters to take the state in particular policy directions and to offer new insights and solutions." *Shakman*, 43 F.4th at 730 (quotation omitted). A newly elected governor's decisions are "a way to implement policy choices and to get things done." *Id.* at

731.  The election or appointment of new policymakers is thus alone an adequate changed circumstance under *Horne*.

There can be no doubt as to the change in policymakers here. The original consent decree was entered into in 2005.  That was two Governors, at least three Commissioners of the Department, and many different Fulton and DeKalb County officials ago.  *See, e.g.*, Doc. 707.  Because there have been "successor officials, both appointed and elected," who can "bring new insights and solutions to problems," that alone is enough to "warrant reexamination of the" consent decree.  *Horne*, 557 U.S. at 448–49 (quotation omitted).

Even if turnover in political leaders alone were not an adequate changed circumstance, there are many others.  *Horne* again is instructive.  The plaintiffs there had alleged that, by providing inadequate English learning instruction, the defendants were violating a federal statute requiring educational agencies to take appropriate action to overcome language barriers that impede equal participation by students.  *Id.* at 438, 441.  Although the challenged injunction was focused on only funding levels, the Supreme Court noted "four important factual and legal changes that may warrant the granting of relief from the judgment" by showing there was no ongoing violation of the federal statute.  *Id.*

at 459. These generally fell into the categories of (i) changed state law, (ii) changed federal law, (iii) structural and management reform of the relevant state agency, and (iv) increased overall funding. *Id.* Crucial changes in each category are present here.

**1.** The relevant state law changes in *Horne* included the passage of a statewide structured English immersion approach, the creation of a task force to research and adopt English immersion models, the creation of an office to aid school districts in implementing the models, and a requirement for the State Board of Education to institute uniform and mandatory training. *Id.* at 459–61. All of those changes suggested likely compliance with federal law because research indicated that immersion was an effective way of overcoming English language barriers. *Id.*

Georgia's state law changes mirror those in *Horne*. Plaintiffs' claims generally were that the State's foster care system was inadequate due to high caseloads, poor recordkeeping, and all-around bad outcomes. But Georgia's dramatic overhaul of its Juvenile Code addresses that. The amended code "compl[ies] with federal law, incorporate[s] social science research and best practices, and reflect[s] consensus among practitioners and stakeholders." Carter, *supra* at 1155. It treats children as equal litigants, *see* O.C.G.A. § 15-11-2(52), with rights to court-

41

appointed attorneys, *id*. § 15-11-103, and guardians ad litem, *id*. § 15-11-476.  It encourages reform and rehabilitation through "community based risk reduction program[s]."  *Id*. § 15-11-38(a).  It provides timelines for preliminary protective hearings, *id*. at 15-11-145(a), petitions for dependency, *id*. at § 15-11-145(g), and case reports, *id*. at § 15-11-200.  And it gives the Division and other stakeholders the power to take emergency action to protect victims of child abuse and neglect.  *Id*. at §§ 15-11-130, 131.  The reforms have worked and continue to improve on-the-ground outcomes.  For example, the number of children in youth confinement and out-of-home placement has declined.  Carter, *supra* at 1158, 1164.

Like the state law changes in *Horne*, Georgia's state law changes mark a shift towards a research-based and proactive approach to child welfare, with demonstrable positive results.

**2.** In *Horne*, the changed federal law was the enactment of the No Child Left Behind Act.  557 U.S. at 461–62.  That statute included provisions conditioning federal funds on states' adoption of performance standards and regular assessments, including on English proficiency.  *Id*.  To be sure, compliance with the No Child Left Behind Act did not, on its own, establish compliance with the federal law the defendants allegedly violated.  But the Act was

42

still relevant because it prompted state reforms, increased federal funding, and provided evidence of improvement through assessment and reporting requirements. *Id.* at 463–64.

The federal laws relevant to the consent decree in this case strike a similar chord. At the time of the original consent decree, the federal regulatory apparatus was relatively new and undeveloped, and the federal government did little to enforce its funding requirements against state child welfare agencies. *See* Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Welfare Laws*, 12 B.U. Pub. Int. L. J. 259, 282–88 (2003). Defendants were stuck playing a game of catch-up in an evolving regulatory landscape. And the consent decree was just another set of requirements for Defendants to balance amid an amorphous federal regulatory environment.

Two decades later, federal oversight is far more developed— and the consent decree is far more duplicative. Applicable federal laws are replete with oversight, assessments, and reporting requirements. Continued federal funding for foster care is tied to meaningful reporting requirements. States must submit reports on their plans for caseworker visits, treatment of foster children's emotional trauma, decreasing time in state custody for children

under the age of five, and preventing at-risk children from entering the foster care system, among other items. *See supra* at 13–14. Federal legislation also required States to amend their code provisions to receive funding. Georgia, like many other states, did so, and granted greater rights to foster children and their adult relatives. *See, e.g.*, O.C.G.A. § 15-11-201(b)(15)(B); *id.* at § 15-11-230(e); *id.* at 15-11-211(c); *see also supra* at 17–18. Additionally, the Children's Bureau undertakes periodic and rigorous reviews of state foster care systems, and a state's failure to comply with adequate improvement plans in connection with those reviews puts federal funding at risk. *Child and Family Services Review (CFSR), supra* at 14. Just as in *Horne*, meaningful federal oversight prompted Defendants' reforms and increased federal funding to Defendants' programs, reinforced through federal agencies' regular assessment and reporting requirements.

**3.** In *Horne*, the Court pointed to the "[s]tructural and management reforms" of reduced class sizes, significantly improved student/teacher ratios, improved teacher quality, a uniform textbook and curriculum planning system, and the elimination of a shortage in instructional materials. 557 U.S. at 465–66. All of those "reforms might have brought" the defendants

"into compliance with the [federal law] even without sufficient [English language learning] incremental funding to satisfy the District Court's original order." *Id.* at 466.

The structural and management reforms in the Division, which address Plaintiffs' original allegations, again parallel *Horne*. Plaintiffs alleged, for example, that the Division violated federal law by having an inadequate management information system. Doc. 194 at 47–49. But the Division introduced a centralized phone line for abuse reporting, Doc. 793-3 at 4, a comprehensive statewide system for all child welfare case records, Doc. 793-2 at 4, an integrated case-management platform, *id.* at 6, and placement option software, *id.* at 4, to solve problems in a data-driven, centralized manner. It also has a new Federal Regulations and Data Section team to process the data and inform department-wide policy making. *Id.* at 7. Regional compliance positions ensure that these new data-driven policies are implemented in ways that comply with federal regulations and address stakeholders' concerns. *Id.* at 7, 9–10.

Plaintiffs also alleged that the Division failed to provide medical, dental, and mental health care to foster children. Doc. 194 at 36–37. But the Division has created a Medical Appeals Team of healthcare attorneys to fight denials of coverage for foster

children's medically necessary treatment.  Doc. 793-3 at 5.  Plaintiffs alleged that caseworkers were inadequately trained and supervised, and had excessive caseloads.  Doc. 194 at 44–47.  But the State has addressed caseworker and foster parent retention rates and training through mentoring programs, Doc. 793-2 at 4–5, hiring more caseworkers, Nolin & Williams, *supra* at 13, and increasing salaries, *see Gov. Kemp Signs FY26 Budget, supra* at 13.

**4.** *Horne* also pointed to "an overall increase in the … funding available." *Horne*, 557 U.S. at 468.  As explained, federal funding has significantly increased for state agencies (tied to reporting requirements). *See supra* at 14.  Moreover, the State itself has increased its fiscal commitment to child welfare over the last ten years.  State funding for children's mental health has increased 15%, the Department of Juvenile Justice's budget has increased 26%, adoptions services allocations have increased 34%, funding for children's welfare services in general has skyrocketed 116%, and child abuse and neglect prevention programs have also increased by 237%. *See supra* at 12.

In sum, there is no disputing that the last 20 years have seen significant and numerous changed circumstances relevant to the consent decree.

### C. There is no ongoing violation of federal law.

In their complaint, Plaintiffs alleged Defendants were violating various substantive due process rights and purported familial-association rights under the First, Ninth, and Fourteenth Amendments jointly. Doc. 194-1 at 29–33. Plaintiffs also asserted violations of three federal statutes: (1) the Federal Adoption Assistance Act; (2) the Multiethnic Placement Act and the Interethnic Adoption Provisions; and (3) the Federal Early Periodic Screening, Diagnosis and Treatment Program of the Medicaid Act. *Id.* at 35–37, 44–45. Premised on those purported statutory violations, Plaintiffs alleged Defendants were violating their procedural due process rights by depriving them of their statutory rights without adequate process. *Id.* at 46–47.

Defendants are not violating any of those federal laws today (assuming they ever were), Doc. 793, nor is there any reason to think Defendants will start. Indeed, Plaintiffs have not bothered to argue Defendants are violating any federal law. *See* Doc. 804. Plaintiffs made the strategic litigation decision to eschew *Horne*'s test and argue instead that Defendants must substantially comply with the consent decree itself absent "unforeseen" changed circumstances. *See, e.g.*, *id.* at 17. Plaintiffs never so much as touched on *Horne*'s requirement to show an ongoing violation of

47

federal law—they never even explained why they thought that standard should not apply. *See id.* at 17–22. They entirely abandoned that issue, effectively conceding they cannot satisfy the *Horne* standard. That deliberate decision is at the very least forfeiture of the issue, if not outright waiver. *See, e.g.*, *Gould v. Interface, Inc.*, 153 F.4th 1346, 1353 (11th Cir. 2025). The upshot is that this Court has no reason to reach the issue of whether Defendants satisfy *Horne*. Defendants obviously do, but given Plaintiffs' forfeiture, if the Court holds that *Horne* applies, it should further hold that Defendants prevail and the consent decree should be terminated.

Regardless, even if Plaintiffs had not forfeited the *Horne* issue, there is no ongoing federal law violation.

**1.** Plaintiffs' claim for violation of substantive due process requires them to prove "(1) a deprivation of a constitutionally protected interest, and (2) that the deprivation was the result of an abuse of governmental power sufficient to raise an ordinary tort to the stature of a constitutional violation." *Littlejohn v. Sch. Bd. of Leon Cnty., Fla.*, 132 F.4th 1232, 1239 (11th Cir. 2025) (quotation omitted). The underlying abuse of power must involve "deliberate indifference to a known injury, a known risk, or a specific duty and [a] failure to perform the duty or act" that

proximately resulted in the foster child's injury. *Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791, 797 (11th Cir. 1987) (en banc) (citation omitted). Deliberate indifference is not just "negligence or carelessness," but a disregard of "a risk of harm of which" the defendant is actually aware. *Ray*, 370 F.3d at 1083. Defendants' extensive efforts to improve the foster care system do not show even negligence or carelessness, much less an outright *disregard* of known risks. Indeed, they show the opposite.

Start with the obvious: Plaintiffs' original factual allegations to support the supposed substantive due process violations simply no longer exist. Their claim was based on Defendants' alleged failures related to (1) investigating and responding to abuse allegations; (2) high caseloads; (3) low caseworker visits; (4) inconsistent caseworker services; (5) accurate and timely casework documentation; and (6) screening and approving foster homes. *See* Doc. 410 at 11. None of these allegations is remotely true today. Defendants now outperform the national average in their response time to child abuse allegations. *See 2024 Child and Family Servs. Reviews Georgia Final Report*, *supra* at 6–8. As to high caseloads and inconsistent caseworker services, that has been addressed through "intense one-on-one mentoring" programs, Doc. 793-2 at 5, regional coordinators, *id.* at 7, 10–11, and salary

49

increases, *Gov. Kemp Signs FY26 Budget*, *supra* at 13. Federal oversight and the Division's Policies require monthly caseworker visits. *See, e.g.*, 42 U.S.C. § 624(f); *Georgia Division of Family & Children Services Child Welfare Policy Manual* § 10.18(4), Ga. Dep't of Hum. Servs., https://tinyurl.com/ycx45h47. As to casework documentation, a panoply of the Division's new data-driven tools address that. *See, e.g.*, Doc. 793-2 at 4; Doc. 793-3 at 6. And Defendants comply with federal review of their adoptive parent licensing, recruitment, and retention efforts. *2024 Child and Family Servs. Reviews Georgia Final Report*, *supra* at 5. And if all of that somehow weren't enough, Georgia's General Assembly has consistently increased the budget for child welfare initiatives, even going so far as to increase children's welfare services funding by 116% and child abuse and neglect prevention programs by 237%. *See supra* at 12.

None of this indicates deliberate indifference, or any other constitutional inadequacy. There is no ongoing violation.

**2.** Plaintiffs also claimed Defendants violated their right under the First, Ninth, and Fourteenth Amendments "not to be deprived of a child-parent or a child-sibling family relationship absent compelling reasons." Doc. 410 at 17 (quotation omitted). This claim is clearly meritless on the law and facts. But even by

reference to the consent decree itself, this claim no longer exists. As the accountability agents' most recent report reflects, the outcome measures regarding familial association have been satisfied. *See* Doc. 818 at 35–38 (showing compliance with the rights of familial association in outcome measures 5, 10, 14, 16, and 25). The consent decree sets a floor *higher* than what the Constitution requires—and Defendants have cleared it.

**3.** Defendants also are not violating any of the federal statutes Plaintiffs initially alleged.

Plaintiffs alleged a violation of the Multiethnic Placement Act because Defendants were allegedly making placement decisions based on race. Doc. 194-1 at 44. There is absolutely no indication that is currently true, thus no basis for finding a statutory violation. No recent report from the accountability agents has focused upon race. *See, e.g.*, Docs. 787, 808, 818. Quite the opposite: The most recent report to mention race confirmed that Defendants encourage foster care placements "to accept all children within their stated scope of expertise, regardless of race, ethnicity, religion, sexual orientation, or gender identity." Doc. 786 at 30. This claim is utterly meritless.[4]

---

[4] Plaintiffs asserted this claim along with an equal protection claim under the *Georgia* constitution, not the United States

There is also no violation of Federal Adoption Assistance and Child Welfare Act.  Plaintiffs asserted a slew of purported rights under the Act, ranging from timely case plans and an adequate information service to healthcare rights and permanency services. *See generally* Doc. 194-1 at 36–37.  Even accepting that premise, there's no violation today.  For example, Plaintiffs claimed a right to timely written case plans and the right to petition for the termination of parental rights, both of which are now required by the Juvenile Code.  *See, e.g.*, O.C.G.A. §§ 15-11-200, 15-11-262. Other asserted rights, such as an adequate information system and denials of medical coverage, have been remedied through the Division's structural changes.  *See* Doc. 793-2 at 4; Doc. 793-3 at 4–6.  Federal oversight has remedied issues regarding foster parent standards and the transition from foster care to independent living.  *See, e.g.*, *2024 Child and Family Servs. Reviews Georgia Final Report*, *supra* at 15 (declaring that Georgia is in "substantial conformity" with federal standards regarding adoptive parent licensing recruitment, and retention).  Besides, if there were any violation at issue, the Children's Bureau would

---

Constitution.  Doc. 194-1 at 42–44.  Even had Plaintiffs asserted a federal equal protection claim it would fail for the same reasons the Multiethnic Placement Act claim fails.

have pulled federal funding. *See, e.g.*, *Child and Family Services Reviews Procedures Manual*, *supra* at 69; 45 C.F.R. § 1355.36(e).

Defendants are also not violating the Federal Early Periodic Screening, Diagnosis and Treatment Program. Plaintiffs claimed a right under that program to receive "any and all treatments deemed necessary by a qualified medical professional conducting any of the periodic health examinations required." Doc. 194-1 at 45. Again, even granting the premise, there's no violation today. Even by reference to the consent decree's outcome measures, 92% of children in Defendants' care do not have any unaddressed medical needs. Doc. 818 at 27. The Division's Office of Health Law and Policy works with insurance agencies specifically to prevent the denial of foster children's medically necessary claims. Doc. 793-2 at 5.

Plaintiffs' procedural due process claim is premised entirely on those statutory claims. Doc. 194-1 at 46–47. Because the statutory claims fail, their procedural due process claim fails, too.

**4.** Finally, *Horne* explains that if "a durable remedy is in place, continued enforcement of the consent decree is not only unnecessary, but improper." *Peery*, 977 F.3d at 1069 (quoting *Horne*, 557 U.S. at 450) (alteration adopted). By "durable remedy," the Court meant a "commitment to remaining in

compliance with federal law" instead of "fleeting federal compliance." *Jackson*, 880 F.3d at 1202–03.  Defendants' compliance with federal law is plainly durable.  As explained, it stems from changes codified into Georgia and federal law.  The Division's structural changes are likewise hardwired into how the Division operates.  This is not a case of "fleeting federal compliance," *id.*, this is the heartland of a durable remedy.

## CONCLUSION

For the reasons set out above, this Court should reverse the judgment of the district court.

Respectfully submitted.

|  |  |
|---|---|
| | */s/ Elijah J. O'Kelley* |
| Harold D. Melton | Christopher M. Carr |
| Alexander J. Hill | *Attorney General of Georgia* |
| Jacob A. Rodon | Stephen J. Petrany |
| | *Solicitor General* |
| | Elijah J. O'Kelley |
| | *Deputy Solicitor General* |
| | Christian Sullivan |
| | *Honors Fellow* |
| | Office of the Georgia |
| Troutman Pepper Locke, LLP | Attorney General |
| 600 Peachtree Street, NE | 40 Capitol Square, SW |
| Atlanta, Georgia 30309 | Atlanta, Georgia 30334 |
| (404) 885-3062 | (470) 816-1342 |
| harold.melton@troutman.com | eokelley@law.ga.gov |
| | *Counsel for Defendant-Appellants* |

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 10,845 words as counted by the word-processing system used to prepare the document.

/s/ *Elijah J. O'Kelley*
Elijah J. O'Kelley

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2025, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

/s/ *Elijah J. O'Kelley*
Elijah J. O'Kelley