No. 25-13412

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

KENNY A., *et al.*,

Plaintiffs-Appellees,

v.

GOVERNOR OF THE STATE OF GEORGIA, *et al.*,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Georgia

**AMICUS BRIEF OF MICHIGAN, IOWA, ALABAMA, ALASKA, ARKANSAS, CONNECTICUT, DISTRICT OF COLUMBIA, IDAHO, INDIANA, KANSAS, LOUISIANA, MISSOURI, MONTANA, NEBRASKA, NEVADA, NORTH DAKOTA, OHIO, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, TEXAS, WASHINGTON, AND WEST VIRGINIA IN SUPPORT OF APPELLANTS AND REVERSAL**

DANA NESSEL
Attorney General of Michigan

Ann M. Sherman
Solicitor General

Neil Giovanatti
Assistant Attorney General
Michigan Department
of Attorney General
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
*Counsel for Amicus State of Michigan*

BRENNA BIRD
Attorney General of Iowa

Eric H. Wessan
Solicitor General

1305 E. Walnut St.
Des Moines, IA 50263
(515) 823-9117
eric.wessan@ag.iowa.gov
*Counsel for Amicus State of Iowa*

**CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, 26.1-2, and 26.1-3, the undersigned counsel certifies that the following listed persons and parties, in addition to those listed in parties' brief, may have an interest in the outcome of this case:

1.    Bird, Brenna – *Counsel for Amicus Curiae;*

2.    Brown, Nicholas W. – *Counsel for Amicus Curiae;*

3.    Cox, Stephen J. – *Counsel for Amicus Curiae;*

4.    District of Columbia - *Amicus Curiae;*

5.    Ford, Aaron D. – *Counsel for Amicus Curiae;*

6.    Griffin, Tim – *Counsel for Amicus Curiae;*

7.    Hanaway, Catherine L. – *Counsel for Amicus Curiae;*

8.    Hilgers, Michael T. – *Counsel for Amicus Curiae;*

9.    Jackley, Marty J. – *Counsel for Amicus Curiae;*

10.    Knudsen, Austin – *Counsel for Amicus Curiae;*

11.    Kobach, Kris W. – *Counsel for Amicus Curiae;*

12.    Labrador, Raul R. – *Counsel for Amicus Curiae;*

13.    Marshall, Steve – *Counsel for Amicus Curiae;*

14.    McCuskey, John B. – *Counsel for Amicus Curiae;*

i

15.    Murrill, Liz – *Counsel for Amicus Curiae;*

16.    Nessel, Dana – *Counsel for Amicus Curiae;*

17.    Paxton, Ken – *Counsel for Amicus Curiae;*

18.    Rokita, Theodore E. – *Counsel for Amicus Curiae;*

19.    Schwalb, Brian L. – *Counsel for Amicus Curiae;*

20.    Skrmetti, Jonathan – *Counsel for Amicus Curiae;*

21.    State of Alabama – *Amicus Curiae;*

22.    State of Alaska – *Amicus Curiae;*

23.    State of Arkansas – *Amicus Curiae;*

24.    State of Connecticut – *Amicus Curiae;*

25.    State of Idaho – *Amicus Curiae;*

26.    State of Indiana – *Amicus Curiae;*

27.    State of Iowa – *Amicus Curiae;*

28.    State of Kansas – *Amicus Curiae;*

29.    State of Louisiana – *Amicus Curiae;*

30.    State of Michigan – *Amicus Curiae;*

31.    State of Missouri – *Amicus Curiae;*

32.    State of Montana – *Amicus Curiae;*

33.    State of Nebraska – *Amicus Curiae;*

ii

34. State of Nevada – *Amicus Curiae;*

35. State of North Dakota – *Amicus Curiae;*

36. State of Ohio – *Amicus Curiae;*

37. State of South Carolina – *Amicus Curiae;*

38. State of South Dakota – *Amicus Curiae;*

39. State of Tennessee – *Amicus Curiae;*

40. State of Texas – *Amicus Curiae;*

41. State of Washington – *Amicus Curiae;*

42. State of West Virginia – *Amicus Curiae;*

43. Tong, William – *Counsel for Amicus Curiae*

44. Wilson, Alan – *Counsel for Amicus Curiae;*

45. Wrigley, Drew – *Counsel for Amicus Curiae;*

46. Yost, Dave – *Counsel for Amicus Curiae*

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ................................................................i

Table of Contents ......................................................................................iv

Table of Authorities...................................................................................vi

Statement of Amici Curiae.........................................................................1

Introduction ...............................................................................................2

Statement of the Issue ...............................................................................5

Summary of Argument...............................................................................5

Argument....................................................................................................6

I.     Longstanding child welfare consent decrees have locked
       dozens of States into inflexible requirements that undermine
       States' efforts to serve children.....................................................6

       A.     Nineteen States are operating child welfare systems
              under consent decrees or settlement agreements. .................7

       B.     States generally cannot exit consent decrees for
              decades. ...............................................................................11

       C.     Consent decrees are often duplicative of federal
              executive branch oversight. .................................................14

       D.     Consent decrees often stifle States' ability to innovate
              and serve children. ..............................................................19

II.    *Horne* provides an appropriately flexible standard to
       evaluate a motion to terminate a consent decree..........................22

Conclusion ...............................................................................................29

Additional States In Support ...................................................................30

iv

Certificate of Compliance ................................................................. 32

Certificate of Filing and Service .......................................................... 33

# TABLE OF AUTHORITIES

<u>Page</u>

**Cases**

*Agostini v. Felton,*
521 U.S. 203 (1997) ...............................................................27

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ...............................................................18

*Charlie H. v. Murphy,*
No. 2:99-cv-03678 (D.N.J. Sept. 2, 2003) ....................................12, 13

*Chisom v. Louisiana ex rel. Landry,*
116 F.4th 309 (5th Cir. 2024)...............................................26

*Connor B. ex rel. Vigurs v. Patrick,*
774 F.3d 45 (1st Cir. 2014)..................................................16

*Dwayne B. v. Whitmer,*
2:06-cv-13548 (E.D. Mich.) .........................................8, 9, 10

*Frew v. Hawkins,*
540 U.S. 431 (2004) .......................................................23, 27

*Horne v. Flores,*
557 U.S. 433 (2009) ...........................2, 4, 6, 10, 22, 23, 24, 25, 26, 28

*Jackson v. Los Lunas Cmty. Program,*
880 F.3d 1176 (10th Cir. 2018) ..............................................24, 25, 26

*Jeremiah M. v. Kovol,*
No. 22-129 (D. Alaska Mar. 24, 2025)........................................21, 22

*Juan F. v. Lamont,*
No. 89-cv-859 (D. Conn. Mar. 14, 2022).............................................12

*L.J. v. Wilbon,*
633 F.3d 297 (4th Cir. 2011) ..............................................26

*Milliken v. Bradley,*
433 U.S. 267 (1977) ...............................................................23

*Peery v. City of Miami,*
977 F.3d 1061 (11th Cir. 2020) ............................................24

*R.C. ex rel. Alabama Disabilities Advocacy. Project v. Walley,*
270 F. App'x 989 (11th Cir. 2008) ........................................28

*Rufo v. Inmates of Suffolk County Jail,*
502 U.S. 367 (1992) ....................................... 22, 25, 26, 27

*Shakman v. Pritzker,*
43 F.4th 723 (7th Cir. 2022) ........................................ 24, 26

*Syst. Fed. No. 91, Ry. Emp. Dep't. v. Wright,*
364 U.S. 643 (1961) ...............................................................27

## Statutes

42 U.S.C. § 5101 *et seq.* .............................................................17

42 U.S.C. § 622(b)(17) .................................................................18

42 U.S.C. § 624(f) .......................................................................18

42 U.S.C. § 629b ........................................................................17

42 U.S.C. § 671(a)(16) .................................................................18

42 U.S.C. § 675a(b)(1) .................................................................18

## Other Authorities

Brenda Donald, *Leading Under a Cloud*, CHILD WELFARE LEAGUE
OF AMERICA 47–54, 48 (2019) ........................................ 13, 19

Casey Family Programs, *Does Contact with Child Protective
Services Vary by Race/Ethnicity and County?* (Oct. 2021),
https://bit.ly/486LsGP ............................................................3

Casey Family Programs, *How Can Child Protection Agencies Respond to Litigation?* (Jan. 4, 2021), https://bit.ly/4oekJhR .................................................................. 5, 13, 21

Casey Family Programs, *How Can Families Affected by Substance Use Disorder Safely Stay Together* (Mar. 20, 2024), https://bit.ly/48cdZef ................................................................................ 3

Casey Family Programs, *Summary of Child Welfare Class Action Litigation* (February 2025), https://bit.ly/4o8FmM8 .................................................................. 8, 9, 11

Casey Family Programs, *What Are Jurisdictions Learning and Doing as They Address Racial Disparities in Child Welfare?* (Feb. 25, 2024), https://bit.ly/49u3oxy ................................................................................ 2

Children's Bureau, U.S. Dep't of Health and Hum. Services, *The Children's Bureau Legacy: Ensuring the Right to Childhood* 201 (2013) ............................................................................................... 15

Jessica Pac, *et al.*, *The Effects of Child Poverty Reductions on Child Protective Services Involvement*, 97 Soc. Servs. Rev. 43 (2023), https://bit.ly/48reGl3 ............................ 2

John Bursch & Maura Corrigan, *Rethinking Consent Decrees*, AMERICAN ENTERPRISE INSTITUTE (June 2016), https://bit.ly/43ZZZ64 ................................................................. 8, 14, 19

Theodore Cross, *et al.*, *Why do Children Experience Multiple Placement Changes in Foster Care? Content Analysis on Reasons for Instability*, 7 J. OF PUB. CHILD WELFARE 39 (2013) ............................................... 14

Zach Strassburger, *Crafting Complaints and Settlements in Child Welfare Litigation*, 21 U.PA. J.L & SOC. CHANGE 2019 (2018) ........................................... 10

**Rules**

Fed. R. Civ. P. 60(b)(5) ........................................................................ 23

## Regulations

45 C.F.R. § 1355.20 ....................................................................... 17, 19

45 C.F.R. § 1355.33(b) ....................................................................... 16

45 C.F.R. § 1355.33(b)(2) ................................................................. 16

45 C.F.R. § 1355.33(c) ....................................................................... 15

45 C.F.R. § 1355.34 ........................................................................... 15

45 C.F.R. § 1355.34(a)(1) ................................................................. 16

45 C.F.R. § 1355.34(b) ....................................................................... 15

45 C.F.R. § 1355.35 ........................................................................... 16

45 C.F.R. § 1355.35(a) ....................................................................... 16

45 C.F.R. § 1355.36 ........................................................................... 16

45 C.F.R. § 1355.41(b) ....................................................................... 17

45 C.F.R. § 1355.42(a)(1) ................................................................. 17

45 C.F.R. § 1355.44 ........................................................................... 17

45 C.F.R. § 1355.52 ........................................................................... 18

45 C.F.R. § 1357.10(c) ....................................................................... 17

45 C.F.R. § 1357.16 ........................................................................... 17

81 Fed. Reg. 35450 ........................................................................... 18

81 Fed. Reg. 35477 ........................................................................... 18

88 Fed. Reg. 66700 ........................................................................... 19

## STATEMENT OF AMICI CURIAE

Amici curiae, Michigan, Iowa, Alabama, Alaska, Arkansas, Connecticut, District of Columbia, Idaho, Indiana, Kansas, Louisiana, Missouri, Montana, Nebraska, Nevada, North Dakota, Ohio, South Carolina, South Dakota, Tennessee, Texas, Washington, and West Virginia, respectfully submit this brief in support of Appellants, the Governor of Georgia and the Georgia Department of Human Resources, *et al.* ("Georgia").

Each of the above-listed amici States are interested in the present appeal because they operate child welfare programs and are party to, involved in, or could potentially be subject to litigation that may result in a remedial order like a consent decree related to their child welfare programs. Especially in the child welfare arena, consent decrees often do not solve the problem they identify. Consent decrees often are not tailored to the interests they are supposedly designed to serve, and they are difficult to exit from, leaving States' child welfare programs subject to judicial oversight for decades.

Requiring States to comply with overbroad and outdated consent decrees restricts States' ability to adjust to evolving challenges and

1

research and implement new evidence-based solutions to provide appropriate services to families and children.  When consent decrees last for years and even decades, States struggle to balance competing requirements and resources while working to improve and modernize their systems.  Such consent decrees are not in the best interest of the children these systems are designed to serve.  Nor are they in the best interest of the States.  And they impose serious costs.

## INTRODUCTION

The U.S. Supreme Court has made clear that lower courts should terminate consent decrees that no longer serve the intended purpose of remedying an alleged violation of federal law and apply a "flexible" standard to determine whether an ongoing violation of federal law persists.  *See Horne v. Flores*, 557 U.S. 433, 450 (2009).  This Court should apply that holding to the crucial context of child welfare.

Child welfare systems carry the burdens of every societal challenge, from poverty to racism to drug epidemics.[1]  As society's

---

[1] *See, e.g.*, Jessica Pac, *et al.*, *The Effects of Child Poverty Reductions on Child Protective Services Involvement*, 97 Soc. Servs. Rev. 43 (2023), https://bit.ly/48reGl3; Casey Family Programs, *What Are Jurisdictions Learning and Doing as They Address Racial Disparities in Child Welfare?* (Feb. 25, 2024), https://bit.ly/49u3oxy; Casey Family Programs,

challenges change, child welfare must pivot to effectively protect and serve children and families.  At the same time, social science research about the best way to serve children is continually evolving, and States must work to implement new, evidence-based best practices, in partnership with the federal government, which oversees state child welfare systems.

For example, when Georgia entered its consent decree 20 years ago, many child welfare systems focused on promptly removing abused or neglected children from their families and placing them in foster homes.  The focus was on timely facilitating adoption of those children to prevent them from lingering in care, which included recruiting foster parents interested in adopting the children in their care.

But today a significant focus of child welfare is the opioid crisis, which has affected millions of children and forced many into child welfare systems.  There have also been significant advances in social science over the past ten, twenty, and even thirty years, including

---

*Does Contact with Child Protective Services Vary by Race/Ethnicity and County?* (Oct. 2021), https://bit.ly/486LsGP; Casey Family Programs, *How Can Families Affected by Substance Use Disorder Safely Stay Together* (Mar. 20, 2024), https://bit.ly/48cdZef.

research about the value of maintaining the family unit and community ties, a focus on identifying and providing services to at-risk families to prevent the need for removal and, when a child must be removed for safety reasons, the importance of placing the child with kin, with the primary goal of reunifying the child with the biological parents where appropriate.

Requiring States to comply with overbroad and outdated consent decrees restricts States' ability to adjust to evolving challenges and research and to implement new evidence-based solutions to provide appropriate services to families and children.  When consent decrees last for years and even decades, States struggle to balance competing requirements and resources while working to improve and modernize their systems.  That is not in the best interest of the children these systems are designed to serve.

Here, in evaluating Georgia's motion to terminate the consent decree (R. 793), the district court did not apply the flexible standard required by the U.S. Supreme Court.  *See Horne,* 557 U.S. at 450. Consequently, as Appellants argue, (see Doc. 29), this Court should reverse the district court's order.

## STATEMENT OF THE ISSUE

The issue presented in this appeal is whether the district court erred in concluding that it need not consider whether Georgia was in violation of federal law to justify the continued imposition of its decades-old consent decree.

## SUMMARY OF ARGUMENT

Historically, advocacy groups used institutional reform litigation as a mechanism to seek comprehensive reform of child welfare systems. *See, e.g.*, Casey Family Programs, *How Can Child Protection Agencies Respond to Litigation?* (Jan. 4, 2021), https://bit.ly/4oekJhR.  Those efforts have resulted in dozens of consent decrees across the nation that have lasted many years (often decades), stifling States' ability to serve children and thrusting Article III courts into the role of overseeing nearly every aspect of state child welfare systems.

Monitoring decades-old consent decrees is an ill-fitted role for federal courts.  Article III courts should not be in the business of managing state and local child welfare programs for decades, even if a State agreed to the arrangement many years ago.  Rather, as the Supreme Court made clear in *Horne v. Flores*, institutional reform

5

consent decrees have a narrow purpose: to eliminate the alleged violation of federal law.  557 U.S. at 450–51.  Once that purpose has been achieved, vacatur of the decree is necessary under Federal Rule of Civil Procedure 60(b).

Here, in evaluating Georgia's motion to terminate the consent decree, the district court did not follow the Supreme Court's instruction that lower courts should vacate institutional reform injunctions if the "violation of federal law has been remedied."  *Horne*, 557 U.S. at 450–51.  Therefore, the district court's order should be reversed.

## ARGUMENT

### I.    Longstanding child welfare consent decrees have locked dozens of States into inflexible requirements that undermine States' efforts to serve children.

Contrary to the Supreme Court's guidance that consent decrees should be flexible and re-evaluated to determine whether their purpose has been met, many States are, or have been, hampered by overly long consent decrees that have become unnecessary and even detrimental to child welfare.

6

## A. Nineteen States are operating child welfare systems under consent decrees or settlement agreements.

As of January 2025, child welfare systems in 19 States are operating under a settlement agreement or consent decree in which a federal court has retained jurisdiction, and many of those decrees and settlements have been in effect for decades:

| Jurisdiction | Year Entered | Years Under Court Oversight |
|---|---|---|
| Maryland | 1988 | 37 |
| Illinois | 1991 | 34 |
| Illinois | 1994 | 31 |
| L.A. County | 2003 | 22 |
| Georgia | 2005 | 20 |
| Mississippi | 2007 | 18 |
| Michigan | 2008 | 17 |
| Oklahoma | 2012 | 13 |
| South Carolina | 2016 | 9 |
| Rhode Island | 2018 | 7 |
| Oregon | 2018 | 7 |
| Florida | 2019 | 6 |
| Missouri | 2019 | 6 |
| New Mexico | 2020 | 5 |
| Arizona | 2020 | 5 |
| Kansas | 2021 | 4 |
| Washington | 2022 | 3 |
| Oregon | 2024 | 1 |
| Maine | 2024 | 1 |
| Tennessee | 2024 | 1 |

*See* Casey Family Programs, *Summary of Child Welfare Class Action Litigation* (February 2025), https://bit.ly/4o8FmM8 ("CFP Summary").

Several other States are litigating cases in which the plaintiffs are seeking relief similar to the settlement agreements and consent decrees discussed above.  *See* CFP Summary (listing Alabama, Alaska, California (Los Angeles and San Bernadino Counties), Indiana, Louisiana, Maryland, New Hampshire, New York, North Carolina, Rhode Island, Tennessee, and West Virginia).

Although consent decrees and injunctions are unique to each case, many decrees follow the same form as the consent decree found in Georgia's case—they outline lofty outcome measures, require ongoing court oversight through a third-party monitor, and impose extensive reporting.  *See, e.g.*, *Dwayne B. v. Whitmer*, 2:06-cv-13548 (E.D. Mich.), ECF 294 (Michigan's consent decree); *see also* John Bursch & Maura Corrigan, *Rethinking Consent Decrees*, AMERICAN ENTERPRISE INSTITUTE (June 2016) at Appendix, Summary of Judicial Decrees Currently Affecting Child-Welfare Systems.[2]  Unlike a settlement in a standard

---

[22] *Available at* https://bit.ly/43ZZZ64.

case, which establishes specific actions the parties agree to perform to resolve the discrete legal violation alleged, child welfare consent decrees tend to revolve around nebulous performance metrics that require States to achieve nearly perfect compliance, often for tasks not within the sole control of the State.  *See* CFP Summary at 1.

For example, Michigan entered into a consent decree in 2008, with 240 different substantive and procedural measures; in the years since, it has been amended several times.  *Dwayne B.*, 2:06-cv-13548, ECF 148 (original 2008 decree), 195 (2011 amended decree), 261 (2016 second amended decree), 294 (2019 amended decree).  Each iteration of the decree contained terms with compliance metrics at 95% or higher.  The 2019 decree, for example, contains three terms with 97% compliance metrics.  *Dwayne B.*, 2:06-cv-13548, ECF 294 at 20, 29 (terms 6.9, 6.33, 6.34).  Another term requires caseworkers to have face-to-face contact with a child's parent each month for any family with the goal of reunification.  *Id.* at 25 (term 6.22).  While no doubt a caseworker should periodically meet the parent, compliance necessitates the parent's cooperation, and, where a parent refuses to meet despite the caseworker's efforts, the State is deemed out of compliance.  *Id.*

9

Other sections mandate that the information that must be contained in medical, dental, and mental health services plans. *Id.* at 28 (term 6.30). But if a caseworker fails to comply with this provision, then the State is out of compliance. *Id.* Like several other terms, this term encourages workers to prioritize filling out paperwork rather than providing care.

So why did States agreed to decrees that required them to take action that was well beyond what federal law required? The answer depends on the State, but settling the case may have been more desirable than defending a contentious lawsuit that receives extensive media attention. *See, e.g.*, Zach Strassburger, *Crafting Complaints and Settlements in Child Welfare Litigation*, 21 U.PA. J.L & SOC. CHANGE 2019 (2018). Also, the Supreme Court has observed that "public officials sometimes consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law" in an effort to "sidestep political constraints" that may otherwise prevent the defendants from implementing the initiatives required by the decree. *See Horne*, 557 U.S. at 448 (cleaned up).

**B.    States generally cannot exit consent decrees for decades.**

One of the problems with consent decrees in the child welfare arena is that they are difficult to exit, increasing the likelihood that they outlive their goals and jeopardize States' ability to be responsive in managing their child welfare system.

Casey Family Programs reports that nine jurisdictions exited court oversight of a child welfare consent decree or injunction between 2015 and January 2025:

| Jurisdiction | Year Filed | Year Closed | Years of Court Involvement |
|---|---|---|---|
| Ohio | 1983 | 2016 | 32 |
| Connecticut | 1989 | 2022 | 32 |
| Milwaukee County | 1993 | 2021 | 28 |
| Washington | 1998 | 2022 | 24 |
| New Jersey | 1999 | 2023 | 23 |
| New York City | 1995 | 2018 | 22 |
| Tennessee | 2000 | 2019 | 18 |
| New York City | 2010 | 2016 | 6 |
| Nevada | 2010 | 2015 | 5 |

*See* CFP Summary.

To do so, several States negotiated and implemented an "exit plan," which took years to implement.  *Id.*  For example, in 2022, after 32 years of court involvement, Connecticut exited its consent decree.

11

The road to exit was long and difficult.  In 1991, the court approved the 120-page Initial Consent Decree.  *See Juan F. v. Lamont*, No. 89-cv-859 (D. Conn. Mar. 14, 2022), ECF 822 at 4.  In December 2003, the district court approved a "Final Exit Plan" and then later approved the "2006 Revised Exit Plan."  *Juan F.*, No. 89-cv-859 (D. Conn. Mar. 14, 2022), ECF 822 at 6, 10.  In 2010, the State moved to vacate the 2006 Revised Exit Plan, but the court denied the motion.  *Id.* at 10–11.  Seven years later, the court approved the 2017 Revised Exit Plan.  *Id.* at 17.  Three decades after it all began, the parties jointly moved to terminate the consent decree a motion which was granted on March 25, 2022.  *Id.*; *Juan F.*, No. 89-cv-859 (D. Conn. Mar. 25, 2022), ECF 826.

The path for New Jersey to exit its consent decree was similarly long and arduous. New Jersey entered into a settlement agreement with court oversight in September 2003, which was modified in 2006. *See Charlie H. v. Murphy*, No. 2:99-cv-03678 (D.N.J. Sept. 2, 2003), ECF 200 (original settlement); *Charlie H.*, No. 2:99-cv-03678 (D.N.J. July 27, 2006), ECF 264 (modified settlement).  In 2016, the settlement agreement was modified again, with this most recent iteration known as the Sustainability and Exit Plan.  *See Charlie H.*, No. 2:99-cv-03678

12

(D.N.J. Nov. 4, 2015), ECF 340.  Finally, in 2022, the parties entered into the Exit Plan and Agreement that resulted in the case finally being dismissed on April 25, 2023.  *See Charlie H.*, No. 2:99-cv-03678 (D.N.J. June 20, 2022), ECF 372; *Charlie H.*, No. 2:99-cv-03678 (D.N.J. April 25, 2023), ECF 386 (dismissal order).

One leader of a child welfare agency under a systemic injunction characterized the exit process as seemingly impossible to achieve, explaining, "As we get closer to the end, it seems as though we will never reach the goal post."  Brenda Donald, *Leading Under a Cloud*, CHILD WELFARE LEAGUE OF AMERICA 47–54, 48 (2019).  Other child welfare leaders have reported that the processes for exiting a consent decree can be "challenging," "even when the agency has achieved a significant level of transformation, maintained improvement for long periods of time, and is heralded nationally as an innovative, well-functioning system."  *See* Casey Family Programs, *How Can Child Protection Agencies Respond to Litigation?*, *supra*.

Exit can be further delayed by circumstances that are beyond the State's control.  For example, in Wisconsin, the consent decree required that 90 percent of children in foster care in Milwaukee experience three

13

or fewer placements.  Wisconsin remained under court oversight because it could reach only 88 percent in the six months before the date of measurement.  *See* Bursch & Corrigan, *supra*, at 6–7.  But the number of placements a child may experience hinges on many factors beyond a State's control, including the willingness of an appropriate foster family to accept the child, changes in a child's medical or behavioral needs that require relocation for the child to receive intensive treatment services, and the success (or lack thereof) of a temporary trial home visit.  *See* Theodore Cross, *et al.*, *Why do Children Experience Multiple Placement Changes in Foster Care? Content Analysis on Reasons for Instability*, 7 J. OF PUB. CHILD WELFARE 39, 47–52 (2013).

## C.    Consent decrees are often duplicative of federal executive branch oversight.

During the decades in which many States have operated under consent decrees, social science research and modern perspective have developed in ways that have created tensions for States striving to comply with the consent decree.  At the same time, federal oversight of child welfare systems has vastly expanded, which has rendered

systemic consent decrees largely duplicative of federal executive branch efforts.

Since Plaintiffs sued Georgia in the early 2000s, federal executive branch oversight of child welfare has changed dramatically.  Today, the federal Administration for Children & Families ("ACF") engages in significant, consistent monitoring of state and local child welfare systems.

For example, in 2001, ACF began auditing child welfare systems through the Child and Family Service Reviews ("CFSR") as a condition of providing federal funding.  Children's Bureau, U.S. Dep't of Health and Hum. Services, *The Children's Bureau Legacy: Ensuring the Right to Childhood* 201 (2013).  CFSRs are designed to evaluate States' performance on seven "outcomes" related to safety, permanency, and child and family well-being, and seven "systemic factors" related to the State's capacity to deliver services leading to improved outcomes for children and families.  45 C.F.R. § 1355.34.  The CFSR has three components: an onsite review of a random sample of child welfare cases, *id.* §§ 1355.33(c), 1355.34(b); "statewide data indicators," which are calculated by ACF and compared to a "national performance indicator,"

15

*id.* §§ 1355.33(b)(2), 1355.34(a)(1); and a statewide self-assessment conducted by state staff and stakeholders, *id.* § 1355.33(b).  ACF evaluates States' performance through the CFSR using deliberately high standards.  *See Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 55 n.11 (1st Cir. 2014) ("The federal standards were intentionally set above the performance of most states . . . specifically to push states to improve against that benchmark.").

Since the review process was first implemented, no State has ever passed the initial stage; every State has had to develop a "program improvement plan" to address the areas identified as "needing improvement," and ACF oversees States' compliance with these plans. 45 C.F.R. § 1355.35.  If ACF determines that a State is not successful at completing the plan, ACF may withhold a portion of the State's federal funding.  *Id.* §§ 1355.35(a), 1355.36.

Beyond the CFSR process, ACF regularly collects and publicly reports extensive data about States' child welfare systems, including: demographic information on every child in custody; the number of removal episodes a child has experienced; the number of placements in the current removal episode; the type of placement setting for each

16

child; the date of the child's most recent court review; the child's most recent case plan goal; when the child entered foster care; and if the child has exited, the date the child exited foster care and the reason the child left custody (for example, reunification, adoption, guardianship, etc.). 45 C.F.R. §§ 1355.20, 1355.41(b), 1355.42(a)(1), 1355.44; *see also* 42 U.S.C. § 5101 *et seq.* (outlining requirements for States to annually report data to the National Child Abuse and Neglect System, which ACF publishes in annual Child Welfare Outcome Reports to Congress).

ACF also requires States to develop Child and Family Service Plans, which are five-year strategic plans that ACF must approve. 42 U.S.C. § 629b; 45 C.F.R. § 1357.10(c). States must then submit to ACF interim Annual Progress and Services reports assessing progress made in accomplishing the Child and Family Service Plans' goals and objectives and identifying forthcoming efforts to further advance those plans' implementation. 45 C.F.R. § 1357.16.

Finally, Congress and ACF have created a host of federal requirements for States' child welfare programs, compliance with which ACF monitors through the oversight mechanisms discussed above. For example, federal law requires that caseworkers must meet with

17

children in state custody at least monthly and develop "case plans" to guide the provision of services to children that meet a host of federal requirements. 42 U.S.C. §§ 622(b)(17), 624(f), 671(a)(16), 675a(b)(1). ACF rules also establish minimum requirements States' data systems must meet to be eligible for federal funding, which can be expensive to implement and maintain. *See* 45 C.F.R. § 1355.52; 81 Fed. Reg. 35450, 35477 (June 2, 2016) (estimating the cost of transitioning to an operational Comprehensive Child Welfare Information System from the previously required legacy system to be $34 million).

The type of systemic child welfare decree to which many States (including Georgia) are subject have become anachronistic in light of this robust federal oversight. ACF now requires States to report key data about their child welfare systems, and ACF holds those States accountable for their performance and for compliance with federal law, which is the "typical" means of enforcement in spending clause programs and preferable to inflexible judicial decrees. *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328–29 (2015).

18

**D.  Consent decrees often stifle States' ability to innovate and serve children.**

Standard best practices in child welfare have evolved since Georgia settled and entered a consent decree in 2005.  *See, e.g.*, Donald, *supra*, at 49.  But in States with stringent, decades-old consent decrees, children might not receive the benefit of that evolution.  *See* Bursch & Corrigan, *supra*, at Executive Summary.  "A consent decree that locks in a certain type of child-welfare practice can become a barrier to adopting a cutting-edge approach that would actually deliver more effective services."  *Id.*

As just one example, in recent years, the field has moved toward placing foster children with kin as the best and least disruptive environment for a child.  88 Fed. Reg. 66700, 66700 (summarizing research).  But consent decrees that impose stringent training and licensing requirements for foster homes may keep a child from living with a grandparent, aunt, or uncle who would otherwise satisfy the more flexible training and licensing standards for kinship homes authorized by federal law.  *See* 45 C.F.R. § 1355.20.  When consent decrees are in tension with modern best practices, child welfare leaders who inherit a consent decree must wrestle with how to focus resources

19

on complying with the checklist of requirements in the consent decree, even if those requirements result in worse situations for children.

Another difficulty is that the metrics imposed by consent decrees are often in tension with one another. For example, the rate at which a system reunifies foster children with their parents is in tension with the time it takes for a child to achieve permanency and exit the foster care system. For a State to facilitate a reunification, it must spend time working with the parent to resolve whatever issues led to the child's removal. This may require the parent to complete substance use disorder treatment, find and maintain a job, or secure stable housing. There can be backsliding or non-linear progress, and before a State permanently reunifies the child with their parent, the State must ensure that the child will be safe with the parent. That process can take time, and where reunification is ultimately in the child's best interest, a State must sacrifice its performance on time-to-permanency to allow a parent to create a safe and stable environment and ensure the child's safety.

Given the tension that arises between consent decrees and best practice, it is unsurprising that States operating under consent decrees

20

have reported that "consent decree measures have a tendency to distract staff and foster a culture of compliance."  *See* Casey Family Programs, *How Can Child Protection Agencies Respond to Litigation?*, *supra.*

James Dimas, who served as the court-appointed monitor in *Kenny A.* for 10 years, said in his recent expert report in another institutional reform case that "Consent decrees undermine the type of organizational culture needed to sustain high performance," and "leave little room for organizations to "have cultures that encourages critical thinking, cultivate adaptive reasoning, and authorize and celebrate creative problem solving."  *Jeremiah M. v. Kovol*, No. 22-129 (D. Alaska Mar. 24, 2025), p 24. ECF 243-1.  Mr. Dimas further stated:

> For supervisors and caseworkers, complying with a consent decree can overshadow the importance of thinking critically about each family's unique characteristics and circumstances and the potential interventions and optimum service sequence needed to address their root problems. Rather than thinking critically about what is *really* needed to help families, their performance focuses on compliance with the consent decree's process requirements.  In systems operating under consent decrees, it is compliance, not critical thinking, that gets celebrated and rewarded.

*Id.* at 25.

Continued operation under consent decree may also limit democratic accountability because the elected officials do not have the flexibility to implement voter-supported policies because they must continue to devote significant resources to comply with the decades-old requirements in the consent decree. *See Horne*, 557 U.S. at 449 (explaining that public officials operating under consent decrees may be "constrained in their ability to fulfill their duties as democratically-elected officials").

Given the constraints imposed and tensions caused by child welfare consent decrees in the ever-evolving field of child welfare, the general principle that "rigidity" is not "appropriate in the context of institutional reform litigation" is particularly applicable in cases involving child welfare. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 382 (1992).

II.   ***Horne* provides an appropriately flexible standard to evaluate a motion to terminate a consent decree.**

In denying Georgia's motion to terminate the consent decree, the district court held that it "need not address the [Appellants'] arguments

as to whether there are ongoing violations of law." (Opinion and Order, R. 821, p. 9.) The district court's reasoning was inconsistent with the Supreme Court's instructions in *Horne*.

*Horne* explained that while "federal courts must vigilantly enforce federal law," they "must remain attentive to the fact that 'federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation.'" 550 U.S. at 450 (quoting *Milliken v. Bradley*, 433 U.S. 267, 282 (1977)). "If a federal consent decree is not limited to reasonable and necessary implementations of federal law, it may improperly deprive future officials of their designated legislative and executive powers." *Id.* (cleaned up) (quoting *Frew v. Hawkins*, 540 U.S. 431, 441 (2004)).

Accordingly, if there is no ongoing violation of federal law, and the State has implemented a "durable remedy" to address any alleged violation of federal law, "continued enforcement of the order is not only unnecessary, but improper," *id.* and a Rule 60(b)(5) motion should be granted because "applying [the order] prospectively is no longer equitable," Fed. R. Civ. P. 60(b)(5). In other words, a court should "apply[] a flexible standard that seeks to return control to state and

23

local officials as soon as a violation of federal law has been remedied."

*Horne*, 557 U.S. at 450–51; *see also Peery v. City of Miami*, 977 F.3d

1061, 1075 (11th Cir. 2020) ("[A] federal court should terminate

supervision once the defendant comes into substantial compliance with

the <u>law</u>, because indefinite federal court oversight of state institutions

is disfavored." (cleaned up and emphasis added)).

That standard for vacatur does not require the movant to "prove a

negative"—it does not require a movant "show that no constitutional

violations, whether measured at the individual level or more

systemically, have recently occurred or will recur." *Shakman v.*

*Pritzker*, 43 F.4th 723, 728, 730 (7th Cir. 2022). Rather, "[t]he

controlling question in determining whether to vacate the [consent

decree] is whether the [movant] has satisfied its objectives, including by

implementing a durable remedy to avoid systemic future constitutional

violations." *Id.*

Further, the term "durable remedy" should be read "flexibly" and

not "too restrictively." *Jackson v. Los Lunas Cmty. Program*, 880 F.3d

1176, 1203 (10th Cir. 2018). The "durable remedy" requirement exists

to ensure that the movant's conduct warranting vacatur or modification

24

is not "fleeting," and "there is no one way for a movant to show that its federal compliance is more than fleeting." *Id.* For example, a "durable remedy" may be "a statute designed to cure the specific federal violation," or it may be "a record of sustained good-faith efforts to remedy federal violations and, to the extent possible, eliminate the vestiges of the federal violation." *Id.*

Indeed, *Horne* observed that Rule 60(b)(5) "serves a particularly important function in . . . 'institutional reform litigation'" because, as explained above, "injunctions issued in such cases often remain in force for many years, and the passage of time frequently brings about changed circumstances—changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights . . . ." , 557 U.S. at 447–48; *see also Rufo*, 502 U.S. at 380 ("Because such decrees [in institutional reform cases] often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased." (internal citation omitted)).

This means that *Horne* "lowered the threshold for defendants to obtain a modification to, or the dissolution of, orders in long-lasting

25

institutional reform cases." *Jackson*, 880 F.3d at 1199.  After *Horne*,

courts have held that consent decrees should be vacated if either "the

objectives of that decree" have been "achieved" because the alleged legal

violation that led to the consent decree is no longer ongoing or the

equities otherwise support vacatur.  *See, e.g.*, *Shakman*, 43 F.4th at

728, 730; *Chisom v. Louisiana ex rel. Landry*, 116 F.4th 309, 316–17

(5th Cir. 2024); *Jackson*, 880 F.3d at 1192; *see also L.J. v. Wilbon*, 633

F.3d 297, 306 (4th Cir. 2011) (explaining that courts must "analyze

whether ongoing enforcement of the original order was supported by an

ongoing violation of federal law" (cleaned up)).

Whether the court's order at issue is a "consent decree" or an

"injunction" does not change this analysis.  While *Horne* itself did not

involve a consent decree, the Supreme Court referenced "consent

decrees" throughout its opinion, *see, e.g.*, 557 U.S. at 449, 453, and there

is little practical difference between a "consent decree" and a court-

ordered injunction in institutional reform cases involving child welfare

programs.

As the Supreme Court explained in *Rufo v. Inmates of Suffolk*

*County Jail*, although a consent decree is an agreement, "it is an

26

agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." 502 U.S. at 378; *see also Agostini v. Felton*, 521 U.S. 203, 215 (1997) (explaining that relief under Rule 60(b) in light of changed circumstances applies to both injunctions and consent decrees). While "[c]onsent decrees have elements of both contracts and judicial decrees," consent decrees "must be directed to protecting federal interests." *Frew*, 540 U.S. at 437. "[A] federal consent decree must spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction; must come within the general scope of the case made by the pleadings; and must further the objectives of the law upon which the complaint was based." *Id.* When that is no longer the case, the court must modify or terminate the consent decree because ultimately, the court is not "acting to enforce a promise but to enforce a statute." *Syst. Fed. No. 91, Ry. Emp. Dep't. v. Wright*, 364 U.S. 643, 651–53 (1961).

Even before *Horne* "lowered the threshold" for dissolving consent decrees, this Court affirmed the termination of a two-decades old consent decree in a class action case with facts similar to Georgia's. In

*R.C. ex rel. Alabama Disabilities Advocacy Project v. Walley*, Alabama entered into a consent decree in 1991 and, in 2005, the district court granted the State's motion to terminate. 270 F. App'x 989 (11th Cir. 2008). On appeal, this Court credited the district court's conclusion that "the Alabama child welfare system had undergone radical changes and was on secure footing to continue its progress in the years to come, without court supervision." *Id.* at 992. This Court concluded that "[t]he system is not yet perfect and may never be, but its improvement has been tremendous," and it ultimately determined that any "deficiencies" that continue to exist "do not require continuation of the consent decree." *Id.*

In sum, a child welfare consent decree should be terminated under Rule 60(b)(5), and control should be "promptly returned to the State," when the *objective* of the consent decree has been achieved, i.e. when a "durable remedy has been implemented" and there is no ongoing, class-wide violation of federal law. *See Horne*, 557 U.S. at 450–51. The district court did not apply that standard in evaluation Georgia's motion to vacate, and therefore its decision should be reversed.

28

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision

of the district court.

Respectfully submitted,

DANA NESSEL
Attorney General of Michigan

BRENNA BIRD
Attorney General of Iowa

Ann M. Sherman
Solicitor General

Eric H. Wessan
Solicitor General

/s/ Neil Giovanatti
Neil Giovanatti
Assistant Attorney General
Michigan Department
of Attorney General
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
*Counsel for Amicus State of*
*Michigan*

1305 E. Walnut St.
Des Moines, IA 50263
(515) 823-9117
eric.wessan@ag.iowa.gov
*Counsel for Amicus State of*
*Iowa*

Dated:  December 11, 2025

29

## ADDITIONAL STATES IN SUPPORT

STEVE MARSHALL
*Attorney General*
*State of Alabama*
P.O Box 300152
Montgomery, AL 36130

STEPHEN J. COX
*Attorney General*
*State of Alaska*
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501-1994

TIM GRIFFIN
*Attorney General*
*State of Arkansas*
101 W. Capitol Avenue
Little Rock, AR 72201-2610

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street, NW., Suite 8100
Washington, DC 20001

RAUL R. LABRADOR
*Attorney General*
*State of Idaho*
P.O. Box 83720
Boise, ID 83720-0010

THEODORE E. ROKITA
*Attorney General*
*State of Indiana*
302 W. Washington Street
Indianapolis, IN 46204

KRIS W. KOBACH
*Attorney General*
*State of Kansas*
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597

LIZ MURRILL
*Attorney General*
*State of Louisiana*
1885 North Third Street
Baton Rouge, LA 70802

CATHERINE L. HANAWAY
*Attorney General*
*Attorney for Missouri*
207 W. High Street
Jefferson City, MO 65101

AUSTIN KNUDSEN
*Attorney General*
*State of Montana*
P.O. Box 201401
Helena, MT 59620-1404

MICHAEL T. HILGERS
*Attorney General*
*State of Nebraska*
2115 State Capitol Building
Lincoln, NE 68509

30

AARON D. FORD
*Attorney General*
*State of Nevada*
100 N. Carson Street
Carson City, NV 89701

DREW WRIGLEY
*Attorney General*
*State of North Dakota*
600 E. Boulevard Avenue
Bismarck, ND 58505-0040

DAVE YOST
*Attorney General*
*State of Ohio*
30 E. Broad Street, 17th Floor
Columbus, OH 43215

ALAN WILSON
*Attorney General*
*State of South Carolina*
P.O. Box 11549
Columbia, SC 29211

MARTY J. JACKLEY
*Attorney General*
*State of South Dakota*
1302 E. Highway 14, Suite 1
Pierre, SD 57501-8501

JONATHAN SKRMETTI
*Attorney General*
*State of Tennessee*
P.O. Box 20207
Nashville, TN 37202

KEN PAXTON
*Attorney General*
*State of Texas*
P.O. Box 12548
Austin, TX 78711-2548

NICHOLAS W. BROWN
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

JOHN B. McCUSKEY
*Attorney General*
*State of West Virginia*
1900 Kanawha Boulevard, E
Charleston, WV 25305

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 32(a)(7)(B)(ii).  It is set in 14-point Century Schoolbook font, which is proportionally spaced.  This brief contains 5,138 words, as calculated by Microsoft Word's word count, excluding the sections identified in Federal Rule of Appellate Procedure 32(f) and 11th Circuit Rule 32-4.


Dated:  December 11, 2025        /s/ Neil Giovanatti
                                                     NEIL GIOVANATTI

## CERTIFICATE OF FILING AND SERVICE

I, Neil Giovanatti, hereby certify that on December 11, 2025, an electronic copy of the foregoing brief was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.


December 11, 2025　　　　　　　/s/ Neil Giovanatti
　　　　　　　　　　　　　　　　NEIL GIOVANATTI